Argued and submitted November 3, 2003, decision of the Court of Appeals affirmed in part and reversed in part; case remanded to the circuit court September 29, 2005

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## CHARLES ROBERT CIANCANELLI,
*Petitioner on Review.*

(CC 98CR2685FE; CA A108122; SC S49707)

121 P3d 613

Robin A. Jones, Senior Deputy Public Defender, Salem, argued the cause and filed the briefs for petitioner on review. With her on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Oregon Public Defense Services.

Charles Robert Ciancanelli, petitioner on review, filed the briefs for himself.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Charles F. Hinkle, Portland, filed the brief for *amicus curiae* ACLU Foundation of Oregon, Inc., and for *amici curiae* Oregonian Publishing Company and other media entities. With him on the brief for Oregonian Publishing Company and other media entities was Stoel Rives LLP.

Chin See Ming, of Perkins Coie LLP, Portland, filed the brief for *amici curiae* ACLU Foundation of Oregon, Inc. and White Bird. With him on the brief were Julia E. Markley and Les Swanson.

Bradley J. Woodworth and Lake James H. Perriguey, of Bradley J. Woodworth & Associates, PC, Portland, filed the briefs for *amicus curiae* Portland Area Privacy Alliance.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

GILLETTE, J.

De Muniz, J., dissented and filed an opinion.

** Kistler, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

In this criminal proceeding, we are asked to decide whether ORS 167.062, which makes it a crime to, among other things, "direct, manage, finance or present" a "live public show" in which the participants engage in "sexual conduct" violates the free expression rights guaranteed by Article I, section 8, of the Oregon Constitution.[1] Drawing on the *"Robertson* framework,"[2] which this court uses to address free expression issues that arise under Article I, section 8, defendant argues that the statute is unconstitutional because it is directed, by its terms, at a form of expression and does not fall within a well-established "historical exception" to the constitutional prohibition on enactment of such laws.

The state disagrees that ORS 167.062 is directed at expression and, for that reason, argues that the statute is constitutionally sound under *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982). However, the state also contends, on a more fundamental level, that the analytical underpinnings of the *Robertson* framework are unsound. It follows, the state asserts, that this court should reexamine that framework and disavow it in favor of a form of "balancing" test that (in the view of the state) more correctly captures the true meaning and scope of Article I, section 8.

For reasons that we set out *post,* we disagree with the state's assertion that the statute is not, by its terms, aimed at expression. We therefore conclude that this case is one to which the *Robertson* framework applies. Respecting that methodology, we accept the state's request that we consider its criticisms of *Robertson.* Having done so, we conclude that the state has failed to show that *Robertson* is incorrect. We therefore adhere to it. Furthermore, we reject categorically the state's proffered alternative, balancing test.

---

[1] Article I, section 8, of the Oregon Constitution provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[2] So named for *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982), the case that first described and applied the framework. We include an extended discussion of *Robertson* and its rationale, 339 Or at 296-97.

## I.  FACTS AND PROCEDURAL BACKGROUND

The following facts are supported by the record. Defendant operated an "adult-oriented" business, Angels, in Roseburg. Angels offered a menu of "shows," to be performed for individual customers or small groups upon payment of a fee. The shows were presented in a small room on the premises.

Undercover policemen visited Angels on two occasions. During the first visit, the officers requested and paid for a "toy show." A female employee of Angels led them into a room and proceeded to "perform" for them by, among other things, removing her clothing and inserting a dildo and her finger into her vagina. During the second visit, the officers paid for a "two girl show." During that show, two women performed a striptease, rubbed their breasts against the officers chests, and engaged in oral sex with one another.

After the second visit, the officers arrested defendant and the performers. Defendant later was charged by indictment with two counts of promoting a live sex show, ORS 167.062, one count of promoting prostitution, ORS 167.012, two counts of compelling prostitution, ORS 167.017, and two counts of using a child in a display of sexual conduct, ORS 163.670 (the latter two counts are based on the fact that one of defendant's performers was under 18 years of age). Before trial, defendant demurred to the indictment, arguing, among other things, that ORS 167.062, on its face, and ORS 167.012, as applied to the conduct at issue, violate the free expression guarantee of Article I, section 8, of the Oregon Constitution and the free speech guarantee in the First Amendment to the United States Constitution. The trial court overruled the demurrers, and the case proceeded to trial. Defendant was convicted of all charges.

On his direct appeal to the Court of Appeals, defendant assigned error, *inter alia*, to the trial court's ruling on his demurrer, again arguing that ORS 167.062 is facially unconstitutional and that ORS 167.012 is unconstitutional as applied to his case. A majority of the Court of Appeals rejected both arguments. The Court of Appeals majority began by accepting, for the sake of argument, the proposition

that a live sex show has content that qualifies as "expression" under Article I, section 8. *State v. Ciancanelli*, 181 Or App 1, 7, 45 P3d 451 (2002). Utilizing the analytical framework for challenges under Article I, section 8, that this court set out in *Robertson*, the Court of Appeals majority nonetheless concluded that ORS 167.062 falls within a "well-established" historical exception to the general prohibition in Article I, section 8, against laws that, by their terms, restrain expression. *Id.* at 19. The majority found support for that conclusion in a line of statutes and cases dating back to the seventeenth century which, taken as a whole, suggest that public nudity and sexual conduct long have been a subject of governmental regulation and punishment in the United States. The majority also relied on the fact that, in the early days of Oregon, it was a crime to expose one's private parts or otherwise to exhibit oneself in a way that is "offensive to decency, or is adapted to excite vicious or lewd thoughts or acts." *Id.* at 12 (quoting General Laws of Oregon, ch 48, § 632, p 559 (Deady 1845-1864)).

In a similar vein, the Court of Appeals majority held that the conduct that is the subject of ORS 167.012 (promoting prostitution) also falls wholly within a longstanding historical exception to Article I, section 8. And, because it does fall within such an exception, the majority concluded that, even if defendant were correct in suggesting that some of the conduct prohibited by ORS 167.012 is or can be "expression," that fact would not raise a constitutional issue. *Ciancanelli*, 181 Or App at 28-31.

## II. METHODOLOGY

On review, defendant argues that the Court of Appeals majority's analysis is contrary to this court's holding in *State v. Henry*, 302 Or 510, 520-23, 732 P2d 9 (1987), that such early restrictions on sexually explicit or obscene expressions between adults as may have existed were not "well established" at the time that early freedoms of expression were adopted or at the time of the adoption of Article I, section 8. Defendant also argues that the Court of Appeals relied almost entirely on cases and statutes pertaining to "lewd" conduct before a nonconsenting public, but pointed to no real

evidence of the historical treatment of private, sexually explicit performances staged for consenting adults.[3]

For its part, the state does not dwell on whether criminal prosecution for promoting a live sex show or prostitution falls within a "historical exception" for purposes of the *Robertson* framework. Instead, it focuses its argument on two points: (1) that the statutes at issue are directed at conduct, not expression; and (2) that, in any event, the entire *Robertson* framework should be abandoned because it is "inconsistent with what language and history teach about the intentions of the [Oregon] constitution's authors." Respecting the latter point, the state notes that, in recent years, this court has utilized a consistent methodology to construe provisions of the Oregon Constitution and has stated repeatedly that its ultimate purpose is to ascertain the intent of the provision's framers and of the people who voted to adopt it. *See, e.g., Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000) (describing methodology and purpose). The state further asserts that this court did not construe Article I, section 8, in *Robertson* by means of that methodology. The state suggests that, under those circumstances,

---

[3] Before this court, defendant focuses on Article I, section 8, of the Oregon Constitution as it applies to ORS 167.062. However, he also argues, either directly in his briefs to this court or by reference to his arguments in the Court of appeals, that: (1) ORS 167.062 violates the First Amendment to the United States Constitution; (2) ORS 167.012, both on its face and as applied to his conduct, violates Article I, section 8, of the Oregon Constitution; (3) certain evidence obtained in searches of his business should have been suppressed because the searches were unlawful; (4) he was entitled to acquittals on the charges of compelling prostitution, ORS 167.017, and using a child in a display of sexual conduct, ORS 163.670, because the evidence in the record was insufficient to support a finding that defendant knew that the child in question was, in fact, a minor; (5) the state was required, and failed, to prove that touching of intimate parts during the performances was for the purpose of and actually was sexually gratifying to the performers; (6) a conversation that the police taped pursuant to a phone tap order should have been suppressed because the police failed to tape the conversation in its entirety; and (7) defendant's rights were violated because businesses like "Angels," operating in other counties, have not been subjects of criminal investigation and prosecution.

Because we agree with defendant that his ORS 167.062 convictions must be overturned under Article I, section 8, we need not consider the first of those arguments, pertaining to the application of the First Amendment to ORS 167.062. We *do* address the second argument, pertaining to the constitutionality of ORS 167.012, because that argument was discussed in the majority and dissenting opinions in the Court of Appeals. We conclude that the remaining arguments do not merit further discussion.

*Robertson* should be set aside and Article I, section 8, should be interpreted by means of this court's present methodological paradigm.

In *Stranahan*, this court summarized the circumstances under which, in spite of the salutary doctrine of *stare decisis*, it will reconsider rules arising out of earlier decisions respecting the Oregon Constitution:

> "[W]e remain willing to reconsider a previous ruling under the Oregon Constitution whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question. We will give particular attention to arguments that either present new information as to the meaning of the constitutional provision at issue or that demonstrate some failure on the part of this court at the time of the earlier decisions to follow its usual paradigm for considering and construing the meaning of the provision in question."

*Stranahan*, 331 Or at 54. As noted, the state has argued that, in *Robertson*, this court failed to follow its "usual paradigm" for construing a provision of the Oregon Constitution.

The "usual paradigm" referred to in *Stranahan* for analyzing an original provision of the Oregon Constitution (such as Article I, section 8) is the one that this court first specifically identified and described in *Priest v. Pearce*, 314 Or 411, 840 P2d 65 (1992). There, we indicated that our search for the intent of those who drafted and adopted an original constitutional provision would address three separate topics: the wording of the constitutional provision, the case law surrounding it, and the historical circumstances leading to its adoption. *Id.* at 415-16. The purpose of our inquiry under the *Priest* methodology is "to understand the wording [of the constitutional provision] in the light of the way that the wording would have been understood and used by those who created the provision * * * and to apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise." *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 90-91, 23 P3d 333 (2001) (internal quotations and citations omitted).

In the decade since the court decided *Priest*, this court consistently has applied that methodology to construe a

number of provisions of the Oregon Constitution. *See, e.g.,*
*Neher v. Chartier,* 319 Or 417, 422-28, 879 P2d 156 (1994)
(utilizing methodology to construe Article I, section 10, of the
Oregon Constitution); *Greist v. Phillips,* 322 Or 281, 296-97,
906 P2d 789 (1995) (same respecting Article VII (Amended),
section 3, of the Oregon Constitution); *Vannatta v. Keisling,*
324 Or 514, 529-36, 931 P2d 770 (1997) (same respecting
Article II, section 8, of the Oregon Constitution); *State v.
Vasquez,* 336 Or 598, 604-13, 88 P3d 271 (2004) (same
respecting Article I, section 10, and Article VII (Amended),
section 5, of the Oregon Constitution).

Relying on this court's expressed willingness in
*Stranahan* to reconsider allegedly erroneous constitutional
decisions, the state proffers an alternative rule to *Robertson,*
supported by an extensive exposition of the wording of, the
history respecting, and the case law decided under Article I,
section 8. Defendant weighs in with an equally able brief sup-
porting the *Robertson* framework, and various *amici* offer
further help. Before addressing those arguments, however,
we wish to add a note respecting requests that this court
reconsider constitutional doctrine.

██ A decent respect for the principle of *stare decisis* dic-
tates that this court should assume that its fully considered
prior cases are correctly decided. Put another way, the prin-
ciple of *stare decisis* means that the party seeking to change a
precedent must assume responsibility for affirmatively per-
suading us that we should abandon that precedent.

Various considerations may add to that responsibil-
ity. The most common such consideration is time. Many deci-
sions of this court serve as precedent in later decisions. Thus,
disavowing one case may undermine the precedential signif-
icance of several others.

The contrast between *Stranahan* and this case illus-
trates the foregoing principle. In *Stranahan,* the allegedly
erroneous decision had been rendered less than 10 years ear-
lier, and few intervening precedents had relied on the earlier
case, *Lloyd Corporation v. Whiffen,* 315 Or 500, 849 P2d 446
(1993). The *Stranahan* majority simply acted at the earliest
possible moment to correct what it perceived to be an analyt-
ical mistake made in the immediately preceding case, *Lloyd*

*Corporation*. The present case, by contrast, involves a challenge not only to *Robertson*, but also to the many cases that this court has decided since 1983 that have utilized its methodology.

■ It follows from the foregoing that the state, in order to prevail in this case, must persuade us, first, that the constitutional rule that it attacks was not formulated either by means of the appropriate paradigm or by some suitable substitute. If the state accomplishes that task, then it still has before it the more difficult task of persuading this court that application of the appropriate paradigm establishes that the challenged constitutional rule is incorrect. Finally, and assuming that it is able to convince us of the incorrectness of the challenged rule, the state must persuade us that, when the passage of time and the precedential use of the challenged rule is factored in, overturning the rule will not unduly cloud or complicate the law.

With respect to the first task described above, we acknowledge that Robertson does not discuss at length the wording, history or case law surrounding the particular clause that has captured the state's attention—that is, the "abuse" clause of Article I, section 8. That is so, most likely, because the parties in that case did not emphasize it. As such, we properly may consider the state's request that we conduct a more complete application of the appropriate paradigm to that aspect of Article I, section 8, than the *Robertson* court was called upon to do. In doing so, however, we once again emphasize that our consideration of such arguments in this or any other similar case does not suggest that we automatically doubt the validity of the holding in the earlier decision. As we have explained respecting that question, the principle of *stare decisis* dictates that our assumption going into the inquiry is just the other way around. And, as our subsequent analysis will demonstrate in detail, our reexamination of *Robertson* in response to the state's argument leads us to conclude that the state has not established, in accordance with its burden discussed above, that *Robertson* incorrectly considered or decided the constitutional issues that the court there addressed under Article I, section 8.

■    As discussed, the *Priest* paradigm requires us to search for the intent of the persons who adopted Article I, section 8, in three separate sources: (1) the text of the constitutional provision; (2) the case law surrounding it; and (3) the historical circumstances leading to its adoption. We turn to that paradigmatic process.

### III.   ANALYSIS OF ARTICLE I, SECTION 8

A.  *Wording*

As noted, Article I, section 8, of the Oregon Constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The first half of the provision is directed at the legislature and other lawmaking bodies ("No law shall be passed * * *."). The provision prohibits enactment of two categories of laws: (1) those that "restrain[ ] the free expression of opinion," and (2) those that "restrict[ ] the right to speak, write or print freely on any subject whatever." The latter category of laws appears to deal only with various modes of communication that use words (*i.e.*, speech, printing, or writing), while the first category seemingly includes laws directed at any mode of "expression."[4] The broad category of "expression" is narrowed somewhat by the specification that the expression be

---

[4] Noah Webster's *An American Dictionary of the English Language* (1828) included the following in its definition of "expression":

> "2. The act of uttering, declaring or representing: utterance; declaration; representation; as an *expression* of the public will.
>
> "* * * * *
>
> "5. In *painting*, a natural and lively representation of the subject; as the *expression* of the eye, of the countenance, or of the particular action or passion.
>
> "6. In *music*, the tone, grace, or modulation of the voice or sound suited to any particular subject; that manner which gives life and reality to ideas and sentiments."

(Emphasis in original.) Also relevant is Webster's definitions of the word "express," including:

> "2. To utter; to declare in words, to speak.
>
> "* * * * *
>
> "5. To represent or show by imitation or the imitative arts; to form a likeness; as in painting or sculpture * * *

an expression of "opinion." That phrase, "expression of opinion," thus appears to refer to expression that, in some way, appraises or judges an object, person, action, or idea.[5] But the concept is not in terms limited to opinion that is communicated by means of words, *i.e.*, expression that is spoken, written, or printed. The phrase could, for example, include nonverbal "artistic" forms of expression like painting, photography, and dance, which often are designed to convey something about the communicator's world view.

The two categories of laws that are prohibited by the first part of Article I, section 8, may be distinguished in another way—by the choice of the terms "restrain" and "restrict." Respecting those terms, it is sufficient here to say that we read the first phrase as referring to laws that restrain or punish expression of opinion[6] and the second phrase as referring to laws that limit speaking, writing, or printing on any subject. Needless to say, that is a very broad prohibition. It precludes any restraint on most forms of expression as well as laws directed at limiting or restricting any conceivable kind of communication.

The second half of Article I, section 8 ("but every person shall be responsible for the abuse of this right"), describes an exception or modification to the broad guarantee (*i.e.*, "this right") set out in the first half. The import of that "abuse clause" depends on the intended meaning of two words— "responsible" and "abuse."

---

"6. To show or make known; to indicate."

*Id.*

[5] Webster's *An American Dictionary of the English Language* defined "opinion" as:

"1. The judgment which the mind forms of any proposition, statement, theory or event, the truth or falsehood of which is supported by a degree of evidence that renders it probable but does not produce absolute knowledge or certainty; * * *

"* * * * *

"3. Settled judgment or persuasion; as religious opinion; political opinion."

[6] Although, as we shall describe, the common *legal* import of the word "restrain" in the context of discussion of restraints on speech was limited to the idea of prior licensing schemes, we find little support for the idea that the term was intended by the drafters to have such a limited connotation. Then or now, the threat of punishment could (and can) be as much a restraint on speech as any prior licensing scheme.

One may be "responsible" for abuse in a number of ways. Although Article I, section 8, logically could be read as referring only to moral responsibility, we think it unlikely that either the framers of the Oregon Constitution or those who voted to adopt it would have viewed a moral admonition as an appropriate subject for a substantive provision of their constitution. Instead, we think it inescapable that the term must be read as referring to *legal* accountability for any "abuse" of the expansive right described in the first clause of Article I, section 8. However, the word alone does not make clear whether, for example, such legal accountability is limited to civil damages, or also may be extended to criminal punishment.[7]

When used as a noun, the term "abuse" meant, at or around the time that it was adopted in Article I, section 8:

"1.   Ill use; improper treatment or employment; application to a wrong purpose; as an *abuse* of our natural powers; an *abuse* of civil rights; or of religious privileges; *abuse* of advantages, etc.

"* * * * *

"5.   Perversion of meaning; improper use or application; as an *abuse* of words."

Webster, *An American Dictionary of the English Language* (emphasis in original). "Abuse," in the context of Article I, section 8, thus appears to mean improper use—that is, use of the right provided by the first clause in a way or for a purpose that, under some unidentified standard, is improper or wrongful. Beyond that, however, the provision offers no further hint as to how abuse of the right granted in the first clause of Article I, section 8, may be distinguished from a proper use of that right.

---

[7] According to Webster, "responsible" meant:

"1.   Liable to account; accountable; answerable; as for a trust reposed or for a debt."

Webster, *An American Dictionary of the English Language*.

## B. *Case Law*

Following our paradigm, we turn to a review of cases that were decided under Article I, section 8, before the *Robertson* decision. We think that it is fair to summarize those cases by saying that they tended to rely, expressly or implicitly, on federal First Amendment jurisprudence. When Article I, section 8, explicitly was at issue, this court tended to view the abuse clause of Article I, section 8, as permitting laws aimed at punishing (as opposed to imposing prior restraints on) expression itself.[8] *See, e.g., State v. Jackson*, 224 Or 337, 349-52, 356 P2d 495 (1960) (sustaining indictment for selling, distributing, and possessing obscene book; observing that Article I, section 8, of the Oregon Constitution appears to adopt Blackstonian view that freedom of speech means only freedom from prior restraint); *City of Portland v. Welch*, 229 Or 308, 322, 367 P2d 403 (1961) (although city movie licensing ordinance violated Article I, section 8, because it amounted to prior restraint, that constitutional provision "does not prohibit sending convicted obscenity dealers to jail"); *State v. Laundy*, 103 Or 443, 204 P 958 (1922) (criminal syndicalism laws aimed at punishing speech that advocates revolution did not violate Article I, section 8).

Although no pre-*Robertson* case contains a systematic analysis of the meaning of Article I, section 8, standing alone, the *Jackson* court made some effort in that direction. The court there quoted Blackstone on the issue of liberty of the press and noted that Blackstone's analysis—that liberty of the press meant only freedom from prior restraint—had been criticized by at least one notable constitutional scholar as unworkable and inconsistent with eighteenth-century history. *Jackson*, 224 Or at 346-47. Having identified the issue, however, the *Jackson* court concluded, without further explanation or analysis, that Article I, section 8 "adopt[s] the formula of [Blackstone's] Commentaries." *Id.* at 348.

---

[8] We put to one side this court's cases holding that defamatory statements "have throughout the history of this state been recognized as an abuse of the right of free expression for which a person is to be held responsible under the provisions of Article I, section 8." *Wheeler v. Green*, 286 Or 99, 118, 593 P2d 777 (1979). The parties here properly focus on governmental restrictions on speech, and we do so as well.

That brings us to *Robertson*—the case that, as we have noted, has become the source of our present framework for analyzing issues that arise under Article I, section 8. We discuss the case in some detail. Before doing so, we note in passing that, in a way, it is curious that *Robertson* should have become the lightning rod for disputes under Article I, section 8. On its face, the case was (and is) a straightforward effort at comparing a statute with the Oregon Constitution and determining whether the two could co-exist. Nothing in the opinion announces, at last explicitly, that it intends to state a new and different standard for interpreting the scope of Article I, section 8.

*Robertson* involved challenges under the First Amendment and Article I, section 8, to the then-current version of the statute defining the crime of coercion. The court declined to consider the First Amendment argument, preferring to map out and utilize an analysis that focused particularly on Oregon's free expression provision, Article I, section 8.

Drawing on comments in an earlier case, *State v. Spencer*, 289 Or 225, 611 P2d 1147 (1980), the *Robertson* court opined that Article I, section 8, is a restriction on lawmakers, prohibiting them from enacting restrictions that are directed by their terms at expression:

> "As stated above, Article I, section 8, prohibits lawmakers from enacting restrictions that focus on the content of speech or writing, either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences. This is the principle applied in *State v. Spencer, supra.* It means that laws must focus on proscribing the pursuit or accomplishment of forbidden results rather than on the suppression of speech or writing either as an end in itself or as a means to some other legislative end."

*Robertson*, 293 Or at 416-17. The court then went on to say, however, that there is an exception to that rule—specifically, that laws that are directed at restraining expression are permissible when the "scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression

were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Id.* at 412. The court specifically identified, as examples, the crimes of "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *Id.*

The *Robertson* court next held that, even when a statute is written to focus on some forbidden result, it is subject to closer scrutiny if it proscribes one or more modes of expression as a *means* to that end:

> "When the proscribed means include speech or writing, however, even a law written to focus on a forbidden effect * * * must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such 'overbreadth.' "

*Id.* at 417-18. The court noted that, on the other hand, when a law is directed *only* against causing a forbidden effect, a person accused of causing that effect by means of expression "would be left to assert * * * that the statute could not constitutionally be applied to his particular words or other expression, not that it was drawn and enacted contrary to [A]rticle I, section 8." *Id.* at 417. That is to say, the person would have to object to the statute on a narrow, "as applied" basis.

The *Robertson* court did not inquire directly into the intent of the people who drafted and adopted Article I, section 8, or mention any other methodology as a basis for its analysis. However, the central points in *Robertson*—the propositions that Article I, section 8, is directed at lawmakers and laws, and that it precludes the adoption of laws that are directed at restraining expression—derive directly from certain words of the provision.

As noted, the *Robertson* framework has become the consistent basis for examining any challenge under Article I, section 8. Among the many cases that have been decided according to that framework are a number that are particularly relevant here, because they involve attempts to ban or regulate expression that has sexual content. In *State v. Henry*, 302 Or 510, 732 P2d 9 (1987), for example, this court

used the *Robertson* framework in holding that a statute prohibiting the possession of obscene material violated the free expression guarantee of Article I, section 8, because it was directed, by its terms, at a type of expression. Notably, the court rejected the state's contention that prohibitions on obscenity fall within a historical exception to the guarantee: While the state was able to show that various legal prohibitions on "lewd" conduct and publications existed during the eighteenth and nineteenth century, the *Henry* court concluded that there was no "well-established" exception equivalent to the acknowledged exceptions for libel, perjury, and forgery. *Id.* at 520-22.

In the later case of *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988), the City of Portland attempted to regulate, rather than prohibit outright, obscene expression by enacting certain zoning restrictions on "adult" bookstores and businesses. The city prefaced the zoning restrictions with "findings" to the effect that "adult" businesses caused certain harmful effects and argued to this court that those findings established that the restrictions were directed at harmful effects, rather than at expression. After noting that the ordinance did not make the adverse effects described in the findings an element of the regulatory standard, the *Tidyman* court concluded that the zoning ordinance was directed at expression and, thus, violated Article I, section 8. *Tidyman*, 306 Or at 185-86.

More recently, in *State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996), this court applied the *Robertson* framework to a criminal statute directed at the producers and purchasers of visual reproductions of children engaged in sexually explicit conduct. This court examined the statute in its context and found that it was directed at a harmful effect—unlawful sexual exploitation of children—in that it made such exploitation a necessary element of any violation. The court concluded that the statute therefore passed muster under Article I, section 8. *Id.* at 550.

Our discussion of the foregoing cases illustrates how this court in recent years has applied the *Robertson* framework to Article I, section 8, challenges. In none of those cases, however, did this court attempt to evaluate systematically

the text and other relevant material surrounding Article I, section 8, to determine what the people who drafted and adopted that provision intended by it.

A fair summary of all the cases that this court has decided under Article I, section 8, would be that, while earlier cases (such as *Jackson*) point one way, and later cases (such as *Robertson* and *Henry*) point another, the later cases do not expressly overrule the earlier ones. We turn to the historical circumstances surrounding the adoption of the provision.

## C. *Historical Circumstances*

In its brief to this court, the state argues that, when viewed in the light both of earlier and contemporary thinking about the concept of free speech and expression, it is clear that Article I, section 8, as it was drafted in 1857, was intended only as a prohibition on prior restraints. According to the state, it also is clear that the "abuse clause" of Article I, section 8, was inserted in recognition of the power of the state to punish, after the fact, any speech that, because of its anti-social tendencies, the legislature deemed to be an "abuse."

The state's argument has some historical support. Certainly, there is evidence that, during the late eighteenth and early nineteenth centuries, most American courts and legal treatises tended to treat the right of free speech as a very limited one, guaranteeing to the individual only a freedom from prior restraint. In fact, it now is widely accepted that, in adopting a prohibition on laws "abridging the freedom of speech, or of the press," as the First Amendment phrased it, many, if not most, of the framers of the First Amendment were thinking in terms of the English common-law notion of freedom of speech, which prohibited prior restraints on the press but did not preclude civil or criminal prosecution, after the fact, for obscene, blasphemous, libelous, or seditious speech. *See generally* Leonard W. Levy, *The Emergence of a Free Press* 220-81 (1985) (setting out that view).[9]

---

[9] Professor Levy examined popular writings, case law, and other material from the prerevolutionary period and found that the American notions of liberty of speech and press at that time were remarkably consistent with the English common law as described by Blackstone. Levy also examined the immediate history of the drafting and adoption of the Bill of Rights and found that, although proponents

It is clear, moreover, that, throughout the nine-teenth century, the most popular legal treatises equated the First Amendment and state constitutional guarantees of free speech primarily with freedom from prior restraint. *See, e.g.,* William Rawle, *A View of the Constitution of the United States of America* (1829) (reprint ed 1970) ("A previous super-intendency of the press, an arbitrary power to direct or pro-hibit its publications are withheld, but the punishment of dangerous or offensive publications * * * is necessary for the peace and order of government and religion."); Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 421 (1868) ("[I]t is well understood and received as a commentary on this provision for the liberty of the press [*i.e.,* the First Amendment], that it was intended to prevent all such previ-ous *restraints* upon publications as had been practiced by other governments") (emphasis in original); Joseph Story, 2 *Commentaries on the Constitution of the United States* 667-68 (1858), *reprinted in* Philip B. Kurland and Ralph Lerner, eds., 5 *The Founders' Constitution* 181 (1987) ("It is plain, then, that the language of this amendment imports no more, than that every man shall have a right to speak, write and print his opinions on any subject whatever, without any prior restraint.").

As the foregoing discussion suggests, most of the mainstream American discussions of the constitutional right to free speech drew heavily (sometimes without attribution) on Blackstone's explication of the common law pertaining to freedom of the press:

---

of the bill often raised concerns about freedom of the press, their rhetoric generally was devoid of any explanation of that phrase that would distinguish it from the pre-vailing view. Levy, *Emergence of a Free Press* at 144-219. Levy also suggests that there actually was very little interest among the framers of the United States Con-stitution in announcing fundamental personal rights in a Bill of Rights, and that the entire project would have died in Congress if it had not been for James Madison's persistence. *Id.* at 220-66.

Levy acknowledges that, shortly *after* the adoption of the Bill of Rights (and, more particularly, after the enactment of the Sedition Act of 1798), there were attempts to explain the First Amendment as a repudiation of the common law. However, Levy suggests that, in the context of the times, those after-the-fact expla-nations are suspect, at least as evidence of the framers' views at the time of the First Amendment's adoption. *Id.* at 309-49.

"[W]here blasphemous, immoral, treasonable, schismatical, seditious or scandalous libels are punished by the English law * * * the *liberty of the press*, properly understood, is by no means infringed or violated. The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: * * * but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity. * * *. Thus the will of individuals is still left free; the abuse only of that free-will is the object of legal punishment. * * *

"So true will it be found, that to censure the licentiousness, is to maintain the liberty of the press."

William Blackstone, 4 *Commentaries on the Laws of England* 151-52 (1783 ed) (reprint ed 1978). Following Blackstone, American legal treatises described the government's power to punish the "licentiousness" of the press, or the "abuse" of the right of free speech. *See* Cooley, *A Treatise on the Constitutional Limitations* at 420 (the right guarantees "the liberty of the press, not its licentiousness"); Story, 2 *Commentaries on the Constitution* at 670 (prohibiting prior restraint but permitting punishment of "dangerous or offensive" expression is proper because "the will of individuals is still left free [and] the abuse only of that free will is the object of legal punishment").

But what constituted "abuse" under that formulation? On that point, the mainstream legal treatises again tended to treat Blackstone as the oracle: His pronouncements—that liberty of speech does not extend to publications that are "improper, mischievous, or illegal" or that are "on a fair and impartial trial * * * adjudged of a pernicious tendency"—often were repeated and endorsed. *See, e.g.*, Story, 2 *Commentaries on the Constitution* at 670-71 (repeating the foregoing phrases from Blackstone). Thus, many respected early and mid-nineteenth century jurists and legal writers appear to have believed that "abuse" covered at least some speech that the governing authority deemed to have anti-social tendencies or to threaten the public peace. That

Blackstonian formulation, purporting to be a restatement of the English common law,[10] extended to broad categories of speech including, apparently, libel, seditious libel, blasphemy, and obscenity.[11]

On the whole, the nineteenth century American judiciary appeared to have shared that limited view of the right to free speech. *See, e.g., Respublica v. Dennie*, 4 Yeates 518, 2 Am Dec 402, 405-06 (Pa 1805) ("Publish as you please in the first instance without control; but you are answerable both to the community and to the individual, if you proceed to unwarrantable lengths."); *Commonwealth v. Blanding*, 20 Mass (3 Pick) 304, 313-14 (Mass 1825) (stating that the free speech provision in the Massachusetts Constitution was intended to prevent previous restraints on publication and does not abrogate the common law, including the then-prevalent common-law understanding that, in libel prosecution, truth may not be asserted as defense); *Commonwealth v. Kneeland*, 37 Mass (20 Pick) 206, 219 (Mass 1838) (the obvious intent behind the free speech provision in Massachusetts Constitution was to prevent the enactment of license laws or other direct restraints upon publication).

At most, the judiciary would concede to a slightly more liberal version of the Blackstonian view—that, in addition to prohibiting prior restraint, freedom of speech and of the press incorporated a "right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy, or individuals." *People v. Croswell*, 3 Johns Cas 335, 392-93 (NY 1804) (reciting that definition in the context of a prosecution under the Alien and Sedition Act); *Pugh v. Starbuck*, 1 Ohio Dec Reprint 143, 149

---

[10] Thus, in 1868, Cooley wrote:

"[W]e understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were in force when the constitutional guaranties were established."

Cooley, *A Treatise on the Constitutional Limitations* at 422.

[11] Notably, Blackstone believed that it was consistent with the common-law notion of freedom of the press to punish even an entirely truthful attack on a public figure, because the sovereign could determine that such a publication would have an undesirable "tendency" to disturb the public peace. *See* Blackstone, 4 *Commentaries on the Laws of England* at 151-52.

(Ohio Sup 1845) (quoting *Croswell*). *See also* James Kent, II *Commentaries on American Law* 17-25 (3d ed 1836) (accepting view that individuals may be criminally punished for challenging individuals or the government in print, but stating that, contrary to Blackstone, the truth of the publication should be available as a defense). That variation on Blackstone's formulation did not challenge the legislature's power to punish undesirable speech, but did extend to defendants threatened with criminal punishment for libel an opportunity to demonstrate their own good motives and the truth of the matter in question.

Interestingly, the foregoing view of the right of free speech was contrary, in many respects, to the philosophy that had animated the American Revolution. Many of the leading lights of the American revolutionary period were greatly influenced by the "natural rights" philosophy that was advanced in the works of John Locke and that later was popularized, and fused with the republican political tradition, by John Trenchard and Thomas Gordon under the *nom de plume* "Cato." *See generally* Levy, *The Emergence of a Free Press* at 109-14 (describing *Cato's Letters* and noting that the letters were revered, quoted, and recommended by the likes of John Adams, Thomas Jefferson, Benjamin Franklin, Josiah Quincy, and John Dickinson). On the issue of freedom of speech, Cato wrote:

> "Without Freedom of Thought, there can be no such Thing as Wisdom; and no such Thing as publick Liberty, without Freedom of Speech; Which is the Right of every Man, as far as by it does not hurt and controul the Right of another; and this is the only Check which it ought to suffer, the only Bounds which it ought to know."

"Of Freedom of Speech," No 15, Feb 4, 1720, in John Trenchard and Thomas Gordon, I *Cato's Letters: Essays on Liberty, Civil and Religious* 96 (reprint ed 1971).

To the more libertarian adherents of the natural rights philosophy, freedom of speech was an "inalienable" natural right—that is, it was not part of the package of natural rights that individuals ceded to the community in order to obtain the protections and benefits of civil society. Rather, it was a right that the individual always retained, as he or

she would in a state of nature. Even for natural rights adherents, however, the right was not absolute. According to the natural rights theory, inalienable rights, such as freedom of conscience and speech, were bounded, as they were in the state of nature, by the equally fundamental rights of other individuals. If the state had any authority at all to act in these protected areas, it was to enforce the fundamental rights of other individuals, not to protect society as a whole from undesirable "tendencies" or to promote the majority's idea of the greater good. That is decidedly different from the Blackstonian notion of "abuse,"[12] which extended to everything that Parliament had identified as contrary to the public good (a notion that included purely social values like order, morality, and religion).

Thus, and particularly in reaction to the ill-advised Alien and Sedition Act of 1798, some early American political thinkers would speak in terms of an "absolute" right of freedom of speech and press, bounded only by the necessity of avoiding injury to the equal rights of another individual. Madison, for example, argued that the First Amendment denied to Congress any power to regulate speech or the press, prospectively or retrospectively, but still expressed concern that individuals have a remedy for injury to their reputations and suggested that that was available under state laws. *See generally* James Madison, *Report on the Virginia Resolutions* (1800), *reprinted in* Kurland and Lerner, 5 *The Founders' Constitution* at 141-46 (criticizing the Alien and Sedition Act as contrary to the First Amendment and rejecting the idea that First Amendment merely adopted common law with

---

[12] We acknowledge that it is somewhat simplistic to describe the Blackstonian approach as being contrary to the natural rights philosophy that was popular at the end of the eighteenth century. Blackstone, in fact, styled himself as an advocate for the natural law philosophy, writing in his *Commentaries* that the "law of nature, being co-eval with mankind, and dictated by God himself, is of course superior in obligation to any other." Blackstone, 1 *Commentaries on the Laws of England* at 41. However, in the end, Blackstone believed that Parliament was—indeed, it had to be—supreme. No matter how he is categorized, Blackstone's ideas contrast sharply with the idea of reserved or inalienable rights that the state may not abridge except to the extent that exercise of those rights invades the rights of another individual. *See* Thomas C. Grey, "The Original Understanding and the Unwritten Constitution," in Neil L. York, ed., *Toward a More Perfect Union, Six Essays on the Constitution* 145, 152 (1988) (so asserting).

respect to freedom of speech). St. George Tucker posited an absolute liberty of speech without restraint, "except as to the injury of any other individual in his person, property, or good name." St. George Tucker, *Blackstone's Commentaries: With Notes and References to the Constitution and Laws of the Federal Government of the United States* (1803), *reprinted in* Kurland and Lerner, 5 *The Founders' Constitution* at 152-58. George Hay, a member of the Virginia House of Delegates, insisted that freedom of the press consisted of absolute freedom to publish what one pleases, "provided he does no injury to any other individual." Hortensius [George Hay], "An Essay on the Liberty of the Press" (1799), in George Hay, *Two Essays on the Liberty of the Press*, 21, 23 (reprint ed 1970).[13] Other notable early speech "libertarians" included Tunis Wortman, who wrote *A Treatise Concerning Political Enquiry and the Liberty of the Press* (1800), and John Thomson, who wrote *An Enquiry Concerning the Liberty and Licentiousness of the Press* (1801).

---

[13] In his essay, Hay drew a sharp distinction between the natural right theory of freedom of the press and the Blackstonian theory with respect to that freedom. He wrote:

"Now freedom is of two kinds, and of two kinds only: one is, that absolute freedom which belongs to man, previous to any social institution; and the other, that qualified or abridged freedom, which he is content to enjoy, for the sake of government and society. I believe there is no other sort of freedom in which man is concerned.

"The absolute freedom, or what is the same thing, the freedom, belonging to man before any social compact, is the power uncontrouled by law, of doing what he pleases, *provided he does no injury to any other individual*. If this definition of freedom be applied to the press, as surely it ought to be, the press, if I may personify it, may do whatever it pleases to do, uncontrouled by any law, *taking care, however, to do no injury to any individual*. This injury can only be by slander or defamation, and reparation should be made for it in a state of nature as well as in society.

"But freedom in society, or what is called civil liberty, is defined to be, natural liberty, so far, restrained by law as the public good requires, and no farther. * * * Now let freedom, under this definition, be applied to the press, and what will the freedom of the press amount to? It will amount precisely to the privilege of publishing, as far as the legislative power shall say, the public good requires: that is to say, the freedom of the press will be regulated by law. If the word freedom was used in this sense, by the framers of the [First A]mendment, they meant to say, Congress shall make no law abridging the freedom of the press, which freedom, however, is to be regulated by law. Folly itself does not speak such language."

Hay, *Two Essays on the Liberty of the Press* at 23-24 (emphasis added).

Although we tend to associate the notion of natural, inalienable rights with the founding of our nation, it is important to note that that idea continued as an important legal and political philosophy until the latter part of the nineteenth century.[14] The theory held particular appeal for the Americans participating in the great westward movement, who often had moved west to avoid the constraints of settled society and tended to place an especially high value on individual liberty. Records of the constitutional conventions of pioneer states are replete with affirmations of the natural rights theory,[15] and many of those states adopted constitutional provisions or preambles expressly declaring the "inalienable natural rights" of man. *See, e.g.*, Ill Const (1848), Art XIII, § 1 (declaring man's natural and inalienable rights); Ind Const (1851), Art I, § 1 (same); Iowa Const (1857), Art I, § 1 (same); Kan Const (1861), § 1 (same); Nev Const (1864), Art I, § 1 (same); Wis Const (1848), Art I, § 1 (same). Some western courts utilized natural-rights thinking in their opinions, rejecting the "general welfare" or "police powers" doctrine that was increasingly being used by state courts to support the idea that private rights always must give way to the social interest in public welfare, safety, and good morals,[16] or holding that such power is limited to or must be based on actual injuries to others.[17]

The struggle over the efficacy of natural rights played a significant role in the defining political issue of the nineteenth century, slavery. Natural rights ideas were taken up wholeheartedly by anti-slavery Republicans, who used them to challenge the legality of slavery. Daniel Farber and

[14] Natural rights-based theories were not replaced by the legal positivism that dominated the twentieth century until well after the Civil War. *See* Steven J. Heyman, *Righting the Balance: An Inquiry into the Foundations and Limits of Freedom of Expression*, 78 B U L Rev 1275, 1299 (1998) (so noting).

[15] *See, e.g.*, the description of Iowa's constitutional conventions in Bruce Kempkes, *The Natural Rights Clause of the Iowa Constitution*, 42 Drake L Rev 593, 622-30 (1993) (describing natural rights thinking expressed during Iowa's Constitutional Convention).

[16] *See, e.g., Beebe v. State of Indiana*, 6 Ind 501, 63 Am Dec 391 (Ind 1855) (legislature could not prohibit manufacture and sale of intoxicating liquors on theory that doing so was for the public good); *Herman v. State*, 8 Ind 545 (Ind 1855) (same).

[17] *See, e.g., State ex rel Zillmer v. Kreutzberg*, 114 Wis 530, 90 NW 1098 (Wis 1902) (so holding).

Suzanna Sherry, *A History of the American Constitution* 258-71 (1990). But abolitionists and anti-slavery Republicans also had a special interest in the free speech implications of the natural rights theory. The abolitionist message was highly unpopular in most of the United States, and the proponents of the message were acutely aware of the threat to free speech presented by majority rule.[18]

Abolitionists therefore argued that legislatures—the instruments of the majority—had no constitutional power to suppress or punish speech because of its supposed "bad tendencies" vis-à-vis the public peace. *See, generally*, Michael K. Curtis, *Free Speech: "The People's Darling Privilege"* 10-13, 194-215 (2000) (describing prevailing "bad tendency" rationale for suppressing unpopular speech and rejection of that rationale by abolitionists and Republicans). However, consistent with traditional natural rights theory, they acknowledged that the God-given right to free expression was limited by the equal rights of others. *See* Steven J. Heyman, *Righting the Balance, An Inquiry into the Foundations and Limits of Freedom of Expression*, 78 B U L Rev 1275, 1297 n 124 (1998) (quoting speeches and writings of abolitionists, including James G. Birney and the Rev. Elijah Lovejoy).

In general, then, we can see that Article I, section 8, was adopted at a time in American history when much of the legal community was content with a narrow, Blackstonian view of freedom of speech, but when a more libertarian approach, which was associated with the natural right theory that initially had animated the American Revolution—still enjoyed significant popular adherence.[19] That background

---

[18] By the 1830s, the Southern states all had passed laws criminalizing the publication or distribution of anti-slavery sentiments and were pushing for similar legislation in Congress and in the Northern States, on the theory that anti-slavery speech was incendiary and threatened the public peace. Although unsuccessful in their efforts to criminalize anti-slavery speech outside of the South, southern leaders did succeed in silencing debate about slavery in the United States Congress and obtaining the cooperation of at least one federal agency, the United States Postal Service, in checking the spread of anti-slavery ideas. *See, generally*, Michael K. Curtis, *Free Speech: "The People's Darling Privilege"* 117-81 (2000) (discussing history).

[19] Perhaps most notably, there is no evidence of any body of thought in nineteenth century America to the effect that the values involved in the concept of freedom of expression involved a balancing of the interests of the government against the individual's interest. Nineteenth century legal thought, one scholar writes,

suggests the question: Which one (if either) of those theories did the framers of Article I, section 8, intend to adopt when they included the "abuse" clause in Article I, section 8? The first place to look for the answer to that question is the direct history of Article I, section 8. We turn to that history now.

We know that Article I, section 8, was part of the original Oregon Constitution and was derived from the free speech guarantee in Indiana's 1851 constitution.[20] Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 468 (1926). As this court acknowledged in *Jackson*, the wording is not peculiar to Oregon and Indiana, and was widely used in other state constitutions, beginning with the Pennsylvania Constitution of 1790. *Jackson*, 224 Or at 348-49.

There is no record of any specific discussion of Article I, section 8, at Oregon's Constitutional Convention in 1857. However, we do have a record of comments made during the Constitutional Convention about a proposed amendment to *another* provision of the draft constitution that shows that a range of points of view was present there. Specifically, Carey reports that, on September 9, 1857, delegate Perry B. Marple moved to amend proposed Article I, section 10, of the draft constitution to provide that, in "prosecutions" for libel, the truth may be given in mitigation of damages, rather than in "justification." Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* at 309. The omnipresent Matthew Deady moved to make the provision even less protective[21] and suggested, by way of illustration, that the editor of the San Francisco Bulletin was guilty of a "malicious use of power" with regard to certain stories that had appeared in that newspaper. *Id.* at

---

"was overwhelmingly dominated by categorical thinking." Morton J. Horwitz, *The Transformation of American Law, 1870-1960* 17 (1992). The modern legal notion of balancing, including the idea of balancing in the area of free speech, did not appear until around 1910. *Id.* at 18.

[20] Indiana's Article I, section 9, provided:

"No law shall be passed restraining the free interchange of thought and opinion, or restricting the right to speak, write or print freely on any subject whatever; but for the abuse of that right every person shall be responsible."

[21] Under Deady's formulation, truth would serve as a basis for mitigating damages only when the publication related to the *public* character of the complainant.

309-10. Thomas Dryer, then editor of the Oregonian, a Whig newspaper, complained bitterly about the suggested amendments as attempts to muzzle the press and suggested that "the previous section [which was to become Article I, section 8] covered all the ground." *Id.* at 310. Delegate George Williams[22] apparently agreed with Dryer that Article I, section 8, "embraced all that was required" and moved to strike the provision pertaining to libel altogether. *Id.* A rather lengthy "debate" between Dryer and Deady ensued, with Deady decrying the "irresponsible public press" and Dryer stating that it would be strange if the press were to be debarred from denouncing corruption and villainy. Dryer also said, in apparent reference to Article I, section 8, that

> "it was also strange that the whole judiciary should lock hands together on this subject. When the newspapers spoke of any prominent official—and told the truth—it was invariably characterized as 'abuse.' "

*Id.*

The dispute between Deady and Dryer suggests that there was no clear agreement among the delegates as to the meaning of the term "abuse" in the context of Article I, section 8. In fact, Dryer seemed to have feared a different kind of "abuse," one in which a conservative judiciary would abuse its authority to interpret the Oregon Constitution to undermine the very freedom that, in Dryer's view, Article I, section 8, sought to guarantee. Neither does it appear that there was any clear winner in the dispute: the delegates may have concluded that Article I, section 8, "covered all the ground," but they did not feel compelled to further clarify the abuse clause.

As to the question whether the original Oregon Constitution reflects a Blackstonian view of individual rights or, instead, has a natural rights focus, the evidence also is mixed. This court previously has noted that the original constitution, as a whole, reflects a basic distrust of legislative power. *See Smothers*, 332 Or at 113 (so stating). Such distrust would be more consistent with a natural rights-based

---

[22] George Williams, a prominent Portland lawyer, later served as Attorney General under President Grant. Grant appointed Williams to be Chief Justice of the Supreme Court of the United States, but the appointment was not confirmed by the Senate.

world view. Certain comments made by delegates to the constitutional convention support that theory. One delegate argued for inclusion of a bill of rights in the constitution on the ground that it would limit the "fractious" spirit of the majority if it tried to "infringe on the rights of the individual citizen." *See* Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* at 102 (comments of delegate Delazon Smith). Another delegate suggested that a bill of rights was necessary only to control a despotic ruler and was irrelevant when the people are sovereign. *Id.* at 102-03 (comments of delegate George Williams). The fact that the framers ultimately opted to include a bill of rights suggests acceptance of the view that at least some individual rights should not be subject to the whims of the majority.

On the other hand, unlike their counterparts in many western states, the framers of the Oregon Constitution did not include any express announcement of the "inalienable" natural rights of man in their constitution. They were content to announce that "all men, when they form a social compact, are equal in right" and that "all power is inherent in the people." Or Const, Art I, § 1. The absence of any declaration of "inalienable" natural rights was noted and decried by some Oregonians at the time,[23] but probably did not affect the ultimate decision to adopt the constitution. As one contemporary commentator put it, "This objection is not sufficient to deter a man really favorable to State government from voting for the Constitution." Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I and II)*, 37 Willamette L Rev 469, 491-92 (2001) (quoting letters to the editor printed in *Oregon Argus* in October 1857).

D.  *The Framers' Intent*

It is against the foregoing textual, historical, and jurisprudential background that we must assess the state's assertion that the *Robertson* framework is contrary to the intent of the people who drafted and adopted Article I, section

---

[23] *See* Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I and II)*, 37 Willamette L Rev 469, 488-92 (2001) (quoting editorials and letters printed in the *Oregon Argus* in October 1857).

8. That assessment necessarily involves an attempt to ascertain, from the information that we have gathered, the framers' intent with respect to the scope and meaning of Article I, section 8.

■ Turning our focus to the first clause of Article I, section 8, one is struck by its sweeping terms, both with respect to the legislative power ("[n]o law shall be passed restraining * * * or restricting") (emphasis added) and the kinds of expression protected ("* * * the free expression of opinion, or * * * the right to speak, write, or print freely *on any subject whatever*") (emphasis added). In fact, the words are so clear and sweeping that we think that we would not be keeping faith with the framers who wrote them if we were to qualify or water them down, unless the historical record demonstrated clearly that the framers meant something other than what they said. As our recitation of the historical circumstances shows, we have found no such demonstration. Thus, it appears to us to be beyond reasonable dispute that the protection extends to the kinds of expression that a majority of citizens in many communities would dislike—profanity, blasphemy, pornography—and even to physical acts, such as nude dancing or other explicit sexual conduct, that have an expressive component. Thus, we have little trouble in concluding that the people who framed and adopted Article I, section 8, as part of the original Oregon Constitution intended to prohibit broadly any laws directed at restraining verbal or nonverbal expression of ideas of any kind.[24]

We also conclude that those same people intended to provide an exception to that broad prohibition—the legislature could provide legal and even criminal remedies for "abuse" of the right to free speech. That is evident from the fact that, however people might have disagreed as to what constituted "abuse" of the right of free expression, no one in

---

[24] We say "any kind" because, whatever else may be said about Article I, section 8, we would turn it into an historical footnote if we were to declare that it referred only to forms of expression commonly used in 1857. Radio and television (not to mention film) thus would go wholly unprotected. Instead, we take the view that "expression," as a concept used in Article I, section 8, must have a scope consonant with society's expanding methods of expressing itself. The same appreciation of the wording of Article I, section 8, leads us to state that many (if not all) art forms—dance, painting, sculpture, music, photography—have, and are generally accepted as having, expressive components.

the United States (with the possible exception of George Hay) was arguing, at that time, that the government *never* could impose criminal penalties, even as a remedy for an undeniable abuse of the right of free expression.

The foregoing leaves us to sort out the pivotal conundrum inherent in Article I, section 8: What is the scope of the term, "the abuse of this right"?[25] As we have seen, based on the philosophical currents swirling through the mid-nineteenth century United States, two opposing answers suggest themselves. On the one hand, the framers of the Oregon Constitution may have intended that the section receive a classically Blackstonian construction, *i.e.*, they may have been satisfied that the only limitation that need be placed on legislative interference with free expression was a denial of the ability to impose prior restraints. If that were the case, then "abuse" of the right of free expression included anything that was deemed to be such by the majority. On the other hand, the framers of the Oregon Constitution may have intended that the section receive a classically natural rights construction, allowing no punishment of expression *qua* expression, even after the fact. In that case, an individual's responsibility for "abuse" of the fundamental right of free expression would be limited to expression that caused some injury to the equally fundamental rights of other individuals.

The difficulty, of course, is that there is no sound basis for placing "the framers," as a whole, into one or the

---

[25] We note that one permissible construction of the second clause of Article I, section 8, would be to read the phrase "this right" in that clause as referring only to the "right to speak, write, or print freely on any subject whatever," and not to extend to the "free expression of opinion," as those phrases are used in the first clause. That is, the use of the word "right" in the second clause could be read to cross-reference only the "right" specifically denominated as such in the first clause. However, we do not so read the reference to "this right" in the second clause, for two reasons.

First, it is difficult to imagine how "the right to speak, write, or print on any subject whatever" could be carried out without from time to time constituting the "free expression of opinion." Thus, the former phrase in the first clause would appear, as a practical matter, to be subsumed by the latter. Second, given the orotund nature of mid-nineteenth century prose, it seems likely that the people who drafted and adopted Article I, section 8, intended and understood the two phrases in the first clause ("restraining * * * free expression" and "restricting the right to speak, write or print") to describe a unitary concept.

other of those categories. Both views were represented at the Constitutional Convention (the exchange between Dreyer and Deady, described above, demonstrates as much) and, presumably, among the population that voted in 1857 to adopt the Oregon Constitution. There is scant evidence of any overt collision between the two philosophies (only the exchange between Dreyer and Deady, described above, might qualify). Certainly, there is no *clear* evidence that one or the other theory prevailed.

In short, no unassailably correct answer, based entirely on the provision's wording, case law, history, or any other objective evidence, is possible. The question then presents itself: In the face of the foregoing impasse about the framers' intent, can the state meet its burden of showing that the *Robertson* framework is contrary to the framers' intent with respect to Article I, section 8? Clearly, it can do so only if it demonstrates that *Robertson* is incompatible with *both* of the possible meanings of that provision that we have identified.

Doubtless, the state *could* demonstrate that *Robertson* is incompatible with the Blackstonian approach: The central tenet of that approach—that any speech that the government deems to be improper or socially undesirable may be punished as "abuse"—could not be farther from the *Robertson* rule. On the other hand, the *Robertson* approach appears to be largely, if not entirely, compatible with the pure "natural rights" approach that we have described. As discussed, that natural rights theory holds that only speech that directly interferes with or harms the fundamental rights of other individuals is punishable (either civilly or criminally) as "abuse." That notion is fully consonant with the idea expressed in *Robertson* that, although speech *qua* speech cannot be punished, acts causing "forbidden results" (which, presumably, would include acts causing harm to other individuals) *can* be punished, even if that result is reached by means of speech.[26]

---

[26] As the *Robertson* opinion has it, Article I, section 8,

"prohibits lawmakers from enacting restrictions that focus on the content of speech or writing either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences. * * * It

We recognize, of course, that some aspects of the *Robertson* framework have no obvious connection to the "natural rights" theory of free speech as we have described it. In particular, *Robertson* states that there are "historical exceptions" to the prohibition on laws restraining free expression and describes those exceptions as restrictions on speech that were "well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Robertson*, 293 Or at 412. However, assuming that the drafters of Article I, section 8, intended to convey something akin to the "natural rights" theory we have described, *Robertson*'s "historical exception" idea does not clash with that intent. Instead, it merely recognizes that there are certain well-recognized traditional crimes that fall under the literal terms of the constitutional prohibition, but that the drafters "demonstrably" did not intend to abolish. The *Robertson* court may have realized that it was necessary to acknowledge such historical exceptions in order to carry out the drafters' intent.[27] In the end, then, *Robertson*'s description of "historical exceptions" is not inconsistent with the framers' intent.

■    We have stated that, in light of this court's longstanding reliance on the *Robertson* framework to resolve issues that arise under Article I, section 8, the burden of demonstrating that that framework is inconsistent with the intent of the people who drafted and adopted Article I, section 8, lies with the party challenging that framework—in this

---

means that laws must focus on proscribing the pursuit or accomplishment of forbidden results rather than on the suppression of speech or writing either as an end in itself or as a means to some other legislative end."

*Robertson*, 293 Or at 416-17.

[27] We also recognize that *Robertson* contains certain statements suggesting that the "abuse clause" pertains to *civil* responsibility for harm done to individuals by means of expression. *Robertson*, 293 Or at 412, 433 n 29. We further recognize that *In re Lasswell*, 296 Or 121, 673 P2d 855 (1983) and *State v. Henry*, 302 Or 510, 732 P2d 9 (1987) amplified that suggestion. However, we do not consider those statements about the scope of the abuse clause to foreclose the possibility of criminal punishment when expression is used to cause actual harm to the fundamental rights of other individuals. In fact, we think that that sort of criminal responsibility can be fully explained in terms of the *Robertson* distinction between prohibitions that are directed in terms at speech or expression and those that are directed at harmful effects. In other words, there does not appear to be any serious conflict between the natural rights theory that we have described and this court's comments about the abuse clause in *Robertson*, *Lasswell*, and *Henry*.

case, the state. It should be clear from the foregoing discussion that the state has failed to meet its burden: To the contrary, after applying the methodology set out in *Priest* to Article I, section 8, we are satisfied that the *Robertson* framework is justified. That framework is generally compatible with the "natural rights" approach that we have described as a possible source of Article I, section 8. Moreover, it is more consistent with that approach than the malleable and indistinct "balancing" test proposed by the state. We therefore will continue to analyze challenges brought under Article I, section 8, using the *Robertson* framework (including *Robertson*'s notion of a historical exception).

■ Before we turn to the task of applying the *Robertson* framework to the case at hand, we believe that it is appropriate to address the "historical exception" aspect of the *Robertson* analysis with more particularity. It has become clear to this court, from the opinion below, the state's arguments in this and other recent cases, and certain commentary in the academic and professional literature,[28] that some students of this court's jurisprudence are intent on reading the historical exception idea of *Robertson* more broadly than the *Robertson* court intended. Those critics of *Robertson* focus exclusively on the words of the oft-quoted test from *Robertson*[29] and, from that standpoint, assume that a "historical exception" is made out by showing that laws prohibiting the expression at issue were more or less widespread at or before the adoption of the federal Bill of Rights and continued to exist in this state after 1859, when the Oregon Constitution was adopted. They do so in spite of the admonition against such thinking in *Henry*. In that case, this court emphasized that

> "the constitutional guarantee of free speech and press will not be overcome by the mere showing of some legal restraints on one or another form of speech or writing. The party opposing a claim of constitutional privilege *must*

---

[28] *See, e.g.*, Jack L. Landau, *Hurrah for the Revolution: A Critical Assessment of State Constitutional Interpretation*, 79 Or L Rev 793, 848-50 (2000).

[29] We refer to *Robertson*'s statement excepting from the general rule restraints that are "wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Robertson*, 293 Or at 412.

*demonstrate that the guarantees of freedom of expression were not intended to replace the earlier restrictions."*

*Henry,* 302 Or at 521 (emphasis added). We note also that *Henry* warned that

" 'contemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles. Constitutional draftsmen are concerned with broad principles of longstanding significance.' "

*Id.* at 521-22 (quoting *State ex rel Oregonian Pub. Co. v. Deiz,* 289 Or 277, 284, 613 P2d 23 (1980)).

To be sure, this court has not elaborated on those passages from *Henry* to explain what a party must show in order to demonstrate that the drafters of Article I, section 8, did not intend to abolish a well-established pre-existing restriction on expression.[30] However, *Robertson* contains some comments that, in our view, are relevant to the problem.

Section V of the *Robertson* opinion contains a lengthy examination of how courts have dealt with laws pertaining to extortion, intimidation, and solicitation—laws that are conceptually related to the prohibition on "coercion" that was at issue in *Robertson* and that fall, in whole or in part, within the historical exception notion. 213 Or at 421-31. The court suggested, in that part of the opinion, that such laws have been upheld in the face of free speech challenges, but generally only to the extent that the threatened action would be independently unlawful if executed. The court suggested that, with respect to those statutes, courts did *not* appear to be much concerned with the coercive effect that threats would have on the hearer. The *Robertson* court summarized the results of its examination as follows:

"To recapitulate, we believe that the constitutional right to speak, write, or print freely on any subject whatever guaranteed in Article I, section 8, was not meant to immunize the use of words in some respects relevant to [the coercion

---

[30] In *Henry,* for example, this court examined the evidence that the state offered—a territorial statute aimed at "obscene" materials "manifestly tending to the corruption of the morals of youth"—and concluded that it was insufficient. *Henry,* 302 Or at 521-22.

statute]. As we have said, one of these is the use of words in the course of what indisputably would have been a conventional crime when Oregon's Bill of Rights was adopted in 1859, or in the course of similar kinds of conventional crimes that lawmakers may from time to time enact.[28] This includes the use of words in the course of soliciting, attempting, carrying out, or concealing other crimes. Therefore Article I, section 8 would not foreclose a statute, otherwise in valid form, that made it criminal to compel another to commit an offense by threats or other verbal means under circumstances in which the demand is meant to be followed and the compulsion is realistically plausible. In such a statute, the focus is on the actual or probable commission of the compelled offense, not on protecting the addressee from hearing the speaker's threats. ORS 163.275, however, is not such a statute. * * * It is not concerned with the performance of the compelled act, which the statute does not require to be unlawful.

---

"[28] We refer to 'conventional' crimes so as not to imply that constitutional freedom of expression today does not extend to crimes known before the Bill of Rights, such as seditious or criminal libel, that restrained freedom of public disclosure and debate."

*Robertson*, 293 Or at 433 and n 28.

Thus, the *Robertson* court drew a distinction between longstanding verbal crimes like solicitation, which (it posited) the drafters of Article I, section 8, did not intend to affect, and other verbal crimes like seditious and criminal libel of similar long standing, which, in its view, the drafters of Article I, section 8, intended to abolish. But how to tell the difference? The fact that *Robertson* dubbed crimes in the first category as "conventional" crimes is unhelpful: The term "conventional" has no obvious meaning in this context that can distinguish one historical verbal crime from another. However, the passage overall (and the material that precedes it) does seem to explain the distinction. Specifically, it seems to suggest that, among the various historical crimes that are "written in terms" directed at speech, those whose *real* focus is on some underlying harm or offense may survive the adoption of Article I, section 8, while those that focus on protecting the hearer from the message do not.

Notably, the examples that *Robertson* provides of valid historical exceptions—"perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants," 293 Or at 412—all fall into the former category: Although the laws making those acts criminal may be "written in terms" directed at speech, all those crimes have at their core the accomplishment or present danger of some underlying actual harm to an individual or group, above and beyond any supposed harm that the message itself might be presumed to cause to the hearer or to society. Also notably, the distinction between "conventional" and other historical speech crimes fits remarkably well with *Robertson*'s overall point—that Article I, section 8, is concerned with prohibitions that are directed at the content of speech, not with prohibitions that focus on causing palpable harm to individuals or groups.

But how does that distinction made in *Robertson* connect to the oft-quoted "test" for a historical exception that also appears in that opinion—that the scope of the restraint must be "wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and the guarantees then or in 1859 demonstrably were not intended to reach"? *Id.* We think that it means that, however well-established a restraint directed in terms against speech or expression might have been at some time in the past, the mere fact that it continued to exist in one form or another *after* the adoption of Article I, section 8, does not sufficiently demonstrate that the framers of that provision did not intend to reach it, unless the restraint itself is of a sort that is consistent with the spirit of Article I, section 8. In other words, for those historical crimes that ultimately focus on some underlying nonspeech harm but, nevertheless, are directed "in terms" at speech, the conflict between their existence and the fundamental principle expressed in Article I, section 8, is not very great, and it may be possible to infer an intention to immunize them from a literal application of Article I, section 8, from the mere fact of their continued existence after the provision's adoption. However, the same cannot be said for historical crimes that are directed at expression, both "in

terms" and in their real focus. For such crimes, we would require a more direct expression of the framers' intent.

## IV. APPLICATION TO ORS 167.062

■ We turn now to the question whether ORS 167.062, the live sex show statute, violates Article I, section 8, of the Oregon Constitution. The statute provides, in part:

"(3)   It is unlawful for any person to knowingly direct, manage, finance, or present a live public show in which the participants engage in sadomasochistic abuse or sexual conduct.

"(4)   Violation of subsection (3) of this section is a Class C felony.

"(5)   As used in * * * this section unless the context requires otherwise:

"(a)   'Live public show' means a public show in which human beings, animals, or both appear bodily before spectators or customers.

"(b)   'Public show' means any entertainment or exhibition advertised or in some other fashion held out to be accessible to the public or member of a club, whether or not an admission or other charge is levied or collected and whether or not minors are admitted or excluded."

For purposes of the statute, "sexual conduct" is defined as

"human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

ORS 167.060(10).

We first must determine whether the statute is directed by its terms at restraining or restricting speech or expression. The state contends that it is not directed at expression but, instead, at conduct that the legislature is entitled to punish. However, the state's briefing on that particular point is somewhat unclear: At some points, it appears

to suggest that ORS 167.062(3) is directed at *public* masturbation and sexual intercourse while, at other points, the briefing suggests that the statute is directed at "masturbation and sexual intercourse *for profit*."

The latter suggestion is easily dismissed. There is nothing in ORS 167.062 that suggests that application of that statute is limited to sexual displays for profit or for which the performers (or any other persons) are paid. In fact, the statute states explicitly that it is irrelevant whether the observers of a live sex show pay an admission fee or other charge. *See* ORS 167.062(5)(b) (defining "public show," for purposes of ORS 167.062, as an exhibition or entertainment held out to be accessible to the public "whether or not an admission or other charge is levied or collected").

Neither can we agree with the state that ORS 167.062 is directed, essentially, at *public* masturbation and sexual intercourse—conduct that, according to the state, the legislature can and does criminalize. The legislature has drawn a clear distinction between sexual conduct that occurs in or in view of a "place to which the general public has access," *see* ORS 163.465 (defining public indecency to include sexual intercourse and deviate sexual intercourse in, or in view of, a "public place" as defined by ORS 161.015(10)), and sexual conduct that occurs in a place to which adult members of the public are invited, but where "patrons are forewarned and viewing is limited to those patrons," *State v. Brooks*, 275 Or 171, 178, 550 P2d 440 (1976). That distinction would be blurred beyond recognition were we to accept the state's contention that ORS 167.062 is directed at "public" sexual conduct. The statute is not so directed.

In arguing against the suggestion that ORS 167.062 is directed at expression, the state also relies on this court's recognition, in *Huffman and Wright Logging Co. v. Wade*, 317 Or 445, 857 P2d 101 (1993), that conduct is not protected expression under Article I, section 8, merely because the actor intends the conduct to convey a message. But, in so arguing, the state loses sight of the fact that the issue here is the overall constitutionality of a statute, not whether defendant can claim that his particular conduct is expressive and therefore immunized from any and all criminal liability. It

may or may not be true that the sexual acts that defendant directed were conduct in the most basic sense and, as such, could be punished under some other statute. But the fact remains that the statute at issue here—ORS 167.062— prohibits and criminalizes those acts *only* when they occur in an expressive context, *i.e.*, in a "live public show." Under those circumstances, we cannot avoid the conclusion that the statute is directed primarily, if not solely, toward the expressive aspect of the conduct that it describes. That is, the statute is one restraining free expression.

We must consider, then, whether the statute is "wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *Robertson*, 293 Or at 412. In the Court of Appeals, the majority reformulated that question into a two-part test: "(1) whether there was a restriction on expression that was 'well-established' during the relevant historical period, and, if so, (2) whether the challenged statute falls 'wholly within' that historical exception." *Ciancanelli*, 181 Or App at 8. The majority ultimately concluded that the statute did fall within a well-established historical exception, based almost exclusively on its presentation of numerous examples of eighteenth and nineteenth century laws prohibiting public nudity and sexuality. The Court of Appeals majority did not at any time address itself to the question that is raised by the last clauses of the *Robertson* framework, *viz.*, whether "the guarantees [of free expression] then [*i.e.*, at the adoption of the Bill of Rights] or in 1859 demonstrably were not intended to reach." *Robertson*, 293 Or at 412. As should be clear from the material that we have quoted from *Henry* and our earlier discussion in this case, that question is not one that can be ignored.

We will assume, for the sake of argument, that the information set out in the Court of Appeals majority opinion is sufficient to support a conclusion that a criminal prohibition on live shows involving displays of nudity and sexuality was well-established in the United States at the time that Article I, section 8, was adopted. The question remains, however, whether the material in that opinion or in any other

submission to this court is sufficient to demonstrate that the people who adopted Article I, section 8, did not intend that the provision affect that prohibition. We have suggested that it may be sufficient to show the continued existence, after the adoption of Article I, section 8, of a historically well-established crime that is directed in terms at speech, but *only* when it is clear that the crime's real focus is on some underlying harm to individuals or groups, and that speech is merely a way of accomplishing that harm. But here, where the criminal prohibitions at issue are and always have been directed at protecting the hearer (or, in this case, viewer) from the message,[31] only a more direct expression of an intent to immunize the historical prohibition would suffice. We see nothing in the state's arguments or elsewhere in the record that even approaches the required showing.

To conclude, ORS 167.062 is directed by its terms at expression and does not fall under a well-established historical exception that the framers of Article I, section 8, demonstrably did not intend to reach. It is unconstitutional on its face. It follows that defendant's convictions under ORS 167.062 must be reversed.

## V. PETITIONER'S OTHER CONVICTIONS

■ Although petitioner makes no separate argument to this court that his convictions under ORS 167.012 for promoting prostitution also violate Article I, section 8, we briefly address that issue. Defendant argued in the Court of Appeals that

---

[31] The state suggests that, because of a supposed connection between live sex shows and prostitution, sexually transmitted diseases, and the exploitation of women, such shows may threaten the health and welfare of the community and that ORS 167.062 ultimately is directed at those harms. However, this court repeatedly has rejected such attempts to find expression harmful by association. *See, e.g., Tidyman*, 306 Or at 185 (city cannot rely on supposed adverse effects of speech to justify prohibition on speech when the adverse effects are not part of the operative text of the statute).

We do not mean to say that the legislature cannot enact laws that are designed to prohibit or punish conduct that amounts to prostitution, the transmission of sexual diseases, or the exploitation of classes of persons. However, we agree with the point in *Robertson* that lawmakers are precluded from enacting restrictions on speech solely on the theory that the speech is connected with some adverse consequences and that, absent the speech, the consequences are, to some indefinable degree, less likely. *Robertson*, 293 Or at 416.

"[t]he same conduct that resulted in defendant's conviction under ORS 167.062 also resulted in his conviction under ORS 167.012. Therefore, even if the described conduct meets the technical definition of prostitution, defendant is still entitled to judgment of acquittal because the dancers were engaged in protected expression."

The Court of Appeals majority rejected that contention, primarily on the ground that prostitution and conduct relating to prostitution fall within a "historical exception" to the broad prohibition in Article I, section 8, on laws restraining expression. *Ciancanelli*, 181 Or App at 27-31.

We too reject the contention that ORS 167.012 implicates Article I, section 8, but on the more basic ground that the statute is not directed at expression. ORS 167.012 prohibits promoting prostitution—owning, controlling, managing, or supervising a prostitution enterprise—regardless of the presence or absence of any circumstances that might add an expressive element to the conduct.[32] It is not targeted either at expression itself or at the expressive aspects of certain conduct. It therefore does not, in and of itself, raise an issue of facial unconstitutionality under Article I, section 8. Defendant's contrary argument is not well taken.

Defendant argues, however, that ORS 167.012 is unconstitutional as applied in his case, because his conduct occurred in conjunction with a "live show" and, thus, was protected expression. That is essentially the same argument that the defendants made, and that we rejected, in *Huffman and Wright Logging*. In that case, as previously noted, environmental protesters who were engaged in an effort to stop a logging operation in the Siskiyou National Forest chained themselves, without permission, to logging equipment that belonged to a logging company, while displaying and shouting anti-logging slogans. The logging company brought an

---

[32] ORS 167.012 provides, in part:

"(1) A person commits the crime of promoting prostitution if, with intent to promote prostitution, the person knowingly:

"(a) Owns, controls, manages, supervises or otherwise maintains a place of prostitution or a prostitution enterprise."

"Place of prostitution" is defined as "any place where prostitution is practiced." ORS 167.002(1). A "prostitution enterprise" is "an arrangement whereby two or more prostitutes are organized to conduct prostitution activities." ORS 167.002(3).

action for trespass, and the protesters attempted to defend their actions on the ground that their conduct was protected expression. We acknowledged the expressive aspect of the conduct, but ultimately concluded that "[t]he message that defendants sought to convey by their conduct, the reason for their conduct, and the spoken and written words accompanying their conduct did not transform defendants' conduct into [protected] speech." *Huffman and Wright Logging*, 317 Or at 458.

In the present case, we have concluded that Article I, section 8, of the Oregon Constitution precludes defendant's prosecution under ORS 167.062 for directing a live public show in which performers engage in certain sexual conduct. We have concluded that, to the extent that ORS 167.062 applies only to sexual conduct in live public shows, it is directed at expression or, at least, the expressive aspect of certain conduct. However, neither that holding, nor the fact that defendant's conduct (directing acts of prostitution) occurred in association with live public shows, transforms his conduct into protected expression for all purposes. Defendant's involvement in directing and profiting from a prostitution enterprise is subject to regulation and punishment, and that is what occurred here.[33] Defendant's convictions for promoting prostitution are affirmed.

The decision of the Court of Appeals is affirmed in part and reversed in part. The case is remanded to the circuit court.

**DE MUNIZ, J.,** dissenting.

I agree that Article I, section 8, of the Oregon Constitution protects a wide variety of expression and communication. *See State v. Stoneman*, 323 Or 536, 541, 920 P2d 535 (1996) (Article I, section 8, extends protection to written and spoken communication, but also to verbal and nonverbal

---

[33] Defendant argues that the evidence in the record does not support the findings in the trial court that performers in the two-girl show committed acts of prostitution within the definition of ORS 167.007(1) and that defendant promoted those acts in violation of ORS 167.012(1), but we do not find those issues to merit discussion. Defendant also challenges the sufficiency of the evidence respecting the age of one of the women who participated in the show, but we conclude that that issue likewise does not merit discussion.

expressions in film, photographs and the like). However, unlike the majority, I cannot conclude that masturbation and sexual intercourse in a "live public show" prohibited by ORS 167.062 is a form of speech that the drafters of the Oregon Constitution sought to protect in Article I, section 8. For the reasons described below, I respectfully dissent.

I commend the majority's attempt to carefully examine the antecedent legal philosophies and debates that foreshadowed the drafting of Article I, section 8, and the abuse clause in particular. Nevertheless, the majority's historical research and analysis fails to demonstrate convincingly that the nineteenth-century legal scholars and commentators on which it relies believed that free speech protections, such as Article I, section 8, extended to the conduct prohibited in ORS 167.062.

The majority correctly recognizes that the text of Article I, section 8, consists of two parts, one part "setting out an expansive right" and another part "apparently qualifying that right." Regarding the first part of the text, the majority seizes upon the term "expression of opinion," trims away the qualification "of opinion," and emphasizes throughout the rest of its opinion that the subject matter of Article I, section 8 is "expression." The majority, however, reads the constitutional text more expansively than I do. The text commands the legislature to respect the free expression of ideas—not conduct—when it forbids laws "restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever." The separate clauses emphasize that the constitution protects the "expression of opinion" as well as the "right to speak, write, or print." The text of Article I, section 8 thus protects ideas and thoughts expressed as opinion in speech and print, but contains nothing in the text that explicitly would protect public masturbation and sexual intercourse.

The second part of Article I, section 8, qualifying the free-speech right is the abuse clause: "every person shall be responsible for the abuse of this right." The majority locates a source for the abuse clause in the writings of William Blackstone, who wrote that individuals are free from prior restraints on publishing, but are responsible for abuse of that

right in publishing "blasphemous, immoral, treasonable, schismatic, seditious or scandalous libels." Blackstone suggests that the scope of the abuse clause is potentially quite wide. Not only that, but the majority concedes that many scholars and jurists in the nineteenth century adhered to Blackstone's understanding of the abuse clause. The majority insists, however, that Blackstone's followers encountered resistance from "libertarians" who grounded their beliefs in eighteenth-century natural rights philosophy. The majority then claims that it is faced with a "conundrum": some scholars and commentators followed the restrictive Blackstonian approach to free speech, while others believed that the law protected profanity, blasphemy, pornography, and other forms of both speech and conduct. The libertarians, in other words, adopted a "classically natural rights construction, allowing no punishment of expression *qua* expression." 339 Or at 312. The conundrum, the majority claims, is that it cannot figure out which view is reflected in Article I, section 8. I submit, however, that the alleged conundrum is one of the majority's own making.

First, Blackstone is considered by many to be a natural-rights thinker of the first rank. *See generally* Albert W. Alschuler, *Rediscovering Blackstone*, 145 U Pa L Rev 1 (1996). Thus, the majority's claim that Blackstone's allegedly narrow-minded views were inconsistent with those of natural-rights advocates is problematic.[1]

Second, the very existence of the text in the abuse clause of Article I, section 8, indicates that Blackstone won

---

[1] *See, e.g.,* William Blackstone, Commentaries on the Laws of England 121 (1765):

"The absolute rights of man, considered as a free agent, endowed with discernment to know good from evil, and with power of choosing those measures which appear to him to be most desirable, are usually summed up in one general appellation, and denominated the *natural liberty of mankind*. This natural liberty consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature: being a right inherent in us by birth, and one of the gifts of God to man at his creation, when he endued him with the faculty of free-will. But every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish."

(Emphasis added.)

the debate, in effect, because the idea of regulating abusive speech came from Blackstone and followers such as Joseph Story and Thomas Cooley, as the majority acknowledges, rather than from the alleged libertarians the majority claims to have located.

Third, the majority describes the alleged libertarians as discussing the right of free speech in favorable terms, but the majority fails to show that those commentators believed, or would have believed that the protections of free speech, such as Article I, section 8, would extend to conduct such as public masturbation and sexual intercourse.

Finally, and perhaps most importantly, the idea that the Victorian-era drafters and ratifiers of the Oregon Constitution sought to bring public masturbation and sexual intercourse within the purview of constitutional free-speech protection is difficult to comprehend. In my view, the Court of Appeals' majority opinion in this case amply demonstrated that, at the time the Oregon Constitution was adopted, pornography, nudity, lewd behavior, and "bawdy-houses" were accepted targets of regulation that enjoyed no constitutional protection based on expressive content. *State v. Ciancanelli*, 181 Or App 1, 9-21, 45 P3d 451 (2002).

Most importantly, it is unnecessary to embark, as the majority does, on a search for the historical truth underlying the framers' intent, or invoke the free-speech framework announced in *Robertson*. Article I, section 8, addresses speech, whereas ORS 167.062 addresses conduct, which is a well-accepted dichotomy in constitutional free-speech law. *See United States v. O'Brien*, 391 US 367, 88 S Ct 1673, 20 L Ed 2d 672 (1968) (draft-card burning not protected speech but subject to regulation as conduct). ORS 167.062 does not on its face, violate Article I, section 8 because the statute is directed at conduct, not at the substance of any opinion or any subject of communication or expression.

It should be beyond dispute that public acts of masturbation and sexual intercourse for profit are not intrinsically expressive or communicative acts. *See Arcara v. Cloud Books, Inc.*, 478 US 697, 705, 106 S Ct 3172, 92 L Ed 2d 568 (1986) (upholding closure of adult bookstore where patrons were engaged in masturbation, oral sex, and prostitution,

court observed that "the sexual activity carried on in this case manifests absolutely no element of protected expression"). Unfortunately, the majority accepts defendant's argument that the statute restrains expression protected by Article I, section 8, because it prohibits sexual conduct in a public show. In essence, according to the majority, masturbation and sexual intercourse before an audience are forms of protected expression. In my view, the question is not resolved so simply. I cannot accept the majority's premise that an apparently limitless variety of conduct can be labeled speech simply because it occurs beneath a proscenium arch or is performed before an audience. Cf. *Paris Adult Theatre I v. Slaton*, 413 US 49, 67, 93 S Ct 2628, 37 L Ed 2d 446 (1973) ("a 'live' performance of a man and a woman locked in a sexual embrace at high noon in Times Square is [not] protected by the Constitution," even if "they simultaneously engage in a valid political dialogue").

Sexual conduct on the street, in the park, or the village square has historically been the subject of criminal regulation. ORS 163.465,[2] the public indecency statute, is directed at the same conduct prohibited by ORS 167.062. The only difference is the particular venue in which the conduct occurs. Unlike the majority, I cannot conclude that legislative regulation of public sex acts must stop at the supposed theater door. Simply because the acts are part of a supposed "live public show" does not necessarily save the conduct from regulation.

I would hold that ORS 167.062 is not directed to the substance of any opinion or any subject of communication. Rather, the statute is directed at conduct that *may* under

---

[2] ORS 163.465 provides:

"(1) A person commits the crime of public indecency if while in, or in view of, a public place the person performs:

"(a) An act of sexual intercourse;

"(b) An act of deviate sexual intercourse; or

"(c) An act of exposing the genitals of the person with the intent of arousing the sexual desire of the person or another person.

"(2)(a) Public indecency is a Class A misdemeanor.

"(b) Notwithstanding paragraph (a) of this subsection, public indecency is a Class C felony if the person has a prior conviction for public indecency or a crime described in ORS 163.355 to 163.445."

some circumstances be expressive. That the conduct *may* in some circumstances be expressive does not mean the statute is facially overbroad in violation of Article I, section 8. Instead, under specific circumstances where masturbation or sexual intercourse are claimed to have some expressive content, an accused's right to "direct, manage, finance or present" such expression can be protected through an applied constitutional challenge or by a jury instruction indicating that an accused may be held accountable only for the non-expressive aspects of his or her conduct.

I therefore respectfully dissent.