Argued and submitted December 18, 2012, affirmed March 19, 2013

FRIENDS OF YAMHILL COUNTY,
James Kruetzbender,
Thomas Abrego,
and Ellen Abrego,
*Petitioners,*
*and*

OREGON DEPARTMENT OF AGRICULTURE,
*Intervenor-Petitioner below,*

*v.*

YAMHILL COUNTY;
Bill Stoller;
Stoller Vineyards, Inc.;
and Red Hills Farm, LLC,
*Respondents.*

Land Use Board of Appeals
2012005; A152666

298 P3d 586

Jennifer M. Bragar argued the cause for petitioners. With her on the brief were William K. Kabeiseman and Garvey Schubert Barer.

Michael J. Gelardi argued the cause for respondents. With him on the brief were Davis Wright Tremaine LLP and Rick Sanai.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Petitioners seek judicial review of a final order of the Land Use Board of Appeals (LUBA). LUBA's order affirmed Yamhill County's approval of respondent Stoller's[1] application for a conditional-use permit to construct a new building—including a tasting room, commercial kitchen, storage, and staff offices—and to host up to 44 events (with meal service) each year—on the Stoller Vineyards property, which is zoned "exclusive farm use" (EFU). Petitioners contend that LUBA's decision contravenes "the limits imposed on commercial uses in conjunction with farm use under ORS 215.283(2)(a)."[2] We review to determine whether LUBA's order is "unlawful in substance," ORS 197.850(9)(a), and affirm.

We take the facts from LUBA's order.[3] The Stoller Vineyards property consists of approximately 373 acres on the site of a former turkey farm. Over 180 acres are currently planted in vineyards, and Stoller plans to plant 30 to 40 more acres of vineyard. Stoller produces 10,000 to 12,000 cases of wine and sells an additional 220 tons of fruit annually.

In 2003, the county approved Stoller's application for a winery under the authority of what is now codified as ORS 215.283(1)(n) (establishing wineries as a permitted use in EFU zones) and ORS 215.452 (setting forth the requirements for permitted-use wineries in EFU zones). The

---

[1] For convenience, we refer to respondents Bill Stoller, Stoller Vineyards, Inc., and Red Hills Farm, LLC, as "Stoller" in this opinion; "respondents" refers, collectively, to those parties and Yamhill County.

[2] Although ORS 215.283 has been amended several times since Stoller completed its application, subsection (2)(a) has not changed. Thus, we cite the existing version of ORS 215.283(2)(a) in this opinion. It provides:

"The following nonfarm uses may be established, subject to the approval of the governing body or its designee in any area zoned for exclusive farm use subject to ORS 215.296:

"(a) Commercial activities that are in conjunction with farm use, including the processing of farm crops into biofuel not permitted under ORS 215.203(2)(b)(K) or subsection (1)(r) of this section."

[3] The parties generally agree that LUBA's order presents an accurate summary of the facts. Petitioners challenge LUBA's *characterization* of the approval as "an expansion of the existing winery"; however, that contention relates to petitioner's legal argument that the county's action constituted approval of a new use—one that is not in conjunction with farm use—which we discuss later in this opinion.

winery included a tasting room. The county's 2003 decision allowed only the sale of "[i]tems directly related to wine, the sales of which are incidental to the retail sale of wine on-site and do not exceed 25 percent of the total gross receipts of the retail facility," including a "limited service restaurant" as defined in ORS 624.010.[4] It also limited Stoller to "three events of one to three days in duration during a calendar year intended to draw customers to the site for the tasting and purchasing of wine."[5]

On May 31, 2011, Stoller applied for a conditional-use permit (CUP), seeking approval for the construction of a new building located near the existing winery that would include a "tasting room, commercial kitchen, offices and storage." It also proposed to conduct 44 events per year on the property and requested approval to provide meal service at the events. The county approved Stoller's application for the building and related activities under ORS 215.283(2)(a) (and related county ordinances) as "[c]ommercial activities that are in conjunction with farm use." For purposes of our opinion, we will refer to commercial activities that are permitted under ORS 215.283(2)(a) as farm-use-related commercial activities.

The county's approval of Stoller's application was subject to various conditions. As to "events,"[6] the county

---

[4] Then, as now, ORS 624.010 defines "limited service restaurant" as "a restaurant serving only individually portioned prepackaged foods prepared from an approved source by a commercial processor and nonperishable beverages." ORS 624.010(5).

[5] LUBA noted a discrepancy between that limitation and the record, which indicated that Stoller Winery "currently hosts approximately 37 on-site visitor activities and events, attracting 25-400 attendees." In their brief on review, respondents explain that Senate Bill (SB) 1055 (2010)—which, according to respondents, "temporarily amended ORS 215.452 to allow unlimited 'private events' at permitted[-]use wineries subject to an income limitation"—"superseded the event limitation in Stoller's 2003 permit, allowing additional events on the Property." Because that discrepancy is of no relevance to our review of the issues presented by the parties in this case, we express no opinion on it.

[6] An "event" is defined, for purposes of the CUP, as "an activity for gathering or combination of activities or gatherings with a common theme, organization, or purpose." Stoller described its events as falling into four categories: (1) public promotions, including daily wine tastings and holiday open houses; (2) wine club activities, such as wine club dinners, an annual picnic, and events for new wine releases; (3) wine industry events, including the annual Oregon Pinot Camp; and (4) community and business events, examples of which include "small Shakespearean

approved a maximum of 44 events per year, conditioned as follows: (1) nine single-day events limited to 400 attendees; (2) three three-day events limited to 400 attendees per day; (3) one three-day event limited to 300 attendees per day; (4) 21 by-invitation-only, single-day events limited to 200 attendees; and (5) 10 by-invitation-only, single-day events limited to 100 attendees. The CUP further provides that

> "[t]he events, whether public or private, are allowed only if those events are: 1) directly related to the sale and promotion of wine produced in conjunction with the winery; 2) incidental and subordinate to the retail sale of wine on-site; 3) hosted by the winery or by patrons of the winery; and 4) feature wine produced in conjunction with the winery. The events shall be held between the hours of 8:00 AM and 11:00 PM. The total number of persons permitted on the subject property at any one time, excluding staff, for any one event shall not exceed four hundred (400) persons."

The CUP also allows catered meals, prepared by a commercial caterer, at any of the events, and authorizes the new on-site commercial kitchen to prepare meals for not more than 72 guests per event.[7] The CUP also requires annual reporting and imposes an income limitation with regard to these activities:

> "An annual report on the facility to show that it meets the conditions related to the events shall be filed with the Planning Director. A fee for such review may be imposed. The gross income from the non[-]wine[-]related activity may not exceed 25 percent of the gross income from the retail sale on-site of wine produced in conjunction with the winery."

Petitioners appealed the county's decision to LUBA, raising three assignments of error—(1) the county erred in allowing the events as a farm-use-related commercial

---

performances, charitable dinners, and benefits and receptions for local business owners."

[7] The approval further provides that the "use is personal to the applicant and does not run with the land," and requires the landowner to sign and record in the deed and mortgage records for the county an affidavit acknowledging that the property is located in an area designated for agricultural uses, whose practices may "create inconveniences for the owners or occupants of the property," but that the county "does not consider it the agricultural operator's responsibility to modify accepted practices to accommodate the owner or occupants of this property, with the exception of such operator's violation of state law."

activity under ORS 215.283(2)(a) "because a winery is not a farm use"; (2) the county erred in authorizing food service, events, and other uses that exceed those permitted under ORS 215.452; and (3) the county's findings that the proposed uses satisfy ORS 215.296—the "farm impact" test—are not based on substantial evidence.[8] LUBA rejected each of petitioners' assignments and affirmed the county's decision.

On judicial review, petitioners, in a single assignment of error, assert that LUBA "[e]rred in affirming the County's Decision to allow a new event venue on farm land in contravention to the limits imposed on commercial uses in conjunction with farm use under ORS 215.283(2)(a)." As refined at oral argument, we understand petitioners' argument to reduce to the following two contentions: (1) the approved commercial activity—in particular, the "events venue and commercial food service facility"—is a new use that cannot be considered to be "in conjunction with farm use" under ORS 215.283(2)(a); and (2) even if it is, the level of activity exceeds the "incidental" limitation imposed on such activity under the applicable law. Respondents, on the other hand, contend that this case presents a straightforward application of ORS 215.283(2)(a), as interpreted in this court's and the Supreme Court's decisions in *Craven v. Jackson County*, 94 Or App 49, 764 P2d 931 (1988) (*Craven I*), aff'd, 308 Or 281, 779 P2d 1011 (1989) (*Craven II*), which the county and LUBA correctly applied. We agree with respondents.

Before addressing petitioners' specific contentions, we pause briefly to trace the development of the pertinent law. The legislature's general policy regarding agricultural land use is set forth in ORS 215.243, which provides:

"The Legislative Assembly finds and declares that:

"(1)  Open land used for agricultural use is an efficient means of conserving natural resources that constitute an important physical, social, aesthetic and economic asset to all of the people of this state, whether living in rural, urban or metropolitan areas of the state.

---

[8] The Oregon Department of Agriculture intervened and raised additional arguments before LUBA; LUBA rejected those arguments as well, and the department does not appear on review.

"(2) The preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources and the preservation of such land in large blocks is necessary in maintaining the agricultural economy of the state and for the assurance of adequate, healthful and nutritious food for the people of this state and nation.

"(3) Expansion of urban development into rural areas is a matter of public concern because of the unnecessary increases in costs of community services, conflicts between farm and urban activities and the loss of open space and natural beauty around urban centers occurring as the result of such expansion.

"(4) Exclusive farm use zoning as provided by law, substantially limits alternatives to the use of rural land and, with the importance of rural lands to the public, justifies incentives and privileges offered to encourage owners of rural lands to hold such lands in exclusive farm use zones."[9]

The statutory provision under which Stoller's application was approved was originally enacted in 1983. *See* Or Laws 1983, ch 826, § 17. It provided:

"Subject to ORS 215.288, the following nonfarm uses may be established, subject to the approval of the governing body or its designate in any area zoned for exclusive farm use:

"(a) Commercial activities that are in conjunction with farm use."

ORS 215.283(2)(a) (1983). Thus, the key wording—"commercial activities that are in conjunction with farm use"—has not changed since its original enactment.

Both we and the Supreme Court addressed the meaning of that provision in *Craven*, which involved the approval of an application for a winery on EFU-zoned land. There, LUBA had affirmed Jackson County's decision approving the applicant's request to establish a winery on a

---

[9] In addition, Statewide Planning Goal 3 states:

"Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space and with the state's agricultural land use policy expressed in ORS 215.243 and 215.700."

OAR 660-015-0000(3).

23-acre parcel zoned EFU as a farm-use-related commercial activity under ORS 215.283(2) (1987). The winery was to be constructed before the accompanying vineyard was fully planted and would process grapes grown on-site (as its vineyard matured) and at other vineyards. A condition of county approval required the applicant to plant at least 12 acres of grapes within the first five years. Among other things, the conditions also limited "retail sales at the winery to wine and other products produced or bottled on the premises with the exception of cork screws, posters of the winery, wine books, postcards of the winery, glasses and T-shirts bearing the winery name and logo." *Craven I*, 94 Or App at 51 (internal quotation marks omitted).

The petitioner, an adjacent land owner, sought judicial review before this court, arguing, among other things, that the winery use was not in conjunction with farm use because it would serve tourists rather than farmers. We concluded that it served both, reasoning that "[a] commercial use which assists farmers in processing and marketing crops can be as supportive of agricultural operations as one which aids them in producing crops." *Id.* at 54. We also rejected the petitioner's argument that "the tasting rooms and sale items, such as glasses and T-shirts, are not connected with farm use, whether or not the winery operation itself is." *Id.* Recognizing that this presented a closer question, we nonetheless concluded:

> "[I]t is consistent with the statute for the county to determine that incidental activities of those kinds can be permitted, to the extent that they are secondary to and support the wine processing and selling activities of the winery. *See Cook v. Yamhill County*, 13 Or LUBA 137 (1985). There is, of course, a risk of the tail wagging the dog in many situations where secondary activities are permitted because they serve primary ones, but petitioner offers no reason for concluding that that risk is present here."

*Id.*

The Supreme Court affirmed. *Craven II*, 308 Or 281. The court first considered whether the proposed winery use could be viewed as a "farm use" under ORS 215.203(2)(a), which—then and now—defines the term to include "the

current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting, and selling crops." The court concluded that a winery could not be considered to be a farm use under ORS 215.203(2)(a) because that would "subvert[]" the "goal of preserving land in productive agriculture."[10] *Id*. at 288. Turning to the question whether the use was permitted under ORS 283.215(2)(a), the court held:

> "The phrase upon which the validity of the CUP turns is 'in conjunction with farm use,' which is not statutorily defined. We believe that, to be 'in conjunction with farm use,' the commercial activity must enhance the farming enterprises of the local agricultural community to which the EFU land hosting that commercial activity relates. The agricultural and commercial activities must occur together in the local community to satisfy the statute. Wine production will provide a local market outlet for grapes of other growers in the area, assisting their agricultural efforts. Hopefully, it will also make [the applicant's] efforts to transform a hayfield into a vineyard successful, thereby increasing both the intensity and value of agricultural products coming from the same acres. Both results fit into the policy of preserving farm land for farm use.

> "Sales of souvenirs which advertise the winery may cause others to come to the area and buy the produce of the vineyards and farms roundabout. Such sales may reinforce the profitability of operations and the likelihood that agricultural use of the land will continue. At least LUBA could reasonably so find, as it did, and interpret the incidental sales of souvenirs with logos as being 'in conjunction with farm use.'"

*Craven II*, 308 Or at 289.

---

[10] The court explained that such an interpretation of "farm use"

"could justify countless uses of agricultural land by leading land use decision makers down the road of profit-making from the sale of agricultural products. Such an interpretation could permit a shopping mall or supermarket as a farm use so long as the wares sold are mostly the products of a farm someplace. Marketing of farm products could be established by a gift shop selling candles of tallow and beeswax, a clothing store that sells wools, cottons, and silks from worms nourished on cultivated mulberry leaves, perhaps even a furrier who specializes in ranch mink coats, a bakery, a coffeehouse, a butcher shop, and a pharmacy with a section featuring natural remedies from floxglove, flea bane, and Saint-John's-wort."

308 Or at 287-88.

While *Craven* was pending in the Supreme Court, the 1989 Legislative Assembly enacted legislation to authorize wineries as *permitted* uses on EFU-zoned land. Specifically, the legislation, which became effective before the Supreme Court issued its decision in *Craven*, amended ORS 215.283(1)—which contains a list of nonfarm uses that may be established on EFU land without being subject to additional local critieria[11]—to include wineries and enacted what is now codified at ORS 215.452, which established acreage requirements and wine production and marketing limitations for those permitted wineries.[12] For example, wineries permitted under ORS 215.283(1) were authorized to sell only "[w]ines produced in conjunction with the winery" and [i]tems directly related to wine, the sales of which are incidental to retail sale of wine onsite," including items "served by a limited services restaurant, as defined in ORS 624.010." ORS 215.452(2)(a), (b) (1989).[13]

The history of that legislation indicates that it was enacted to permit certain wineries to be sited on EFU land under a process that is quicker and simpler than the conditional-use process that is available under ORS 215.283(2)(a). *See, e.g.*, Testimony, Senate Committee on Agriculture and Natural Resources, HB 2903-A, May 15, 1989, Ex F (statement of Bill Nelson, Executive Director of the Oregon Winegrowers' Association) (explaining that the

---

[11] Uses established under subsection (1) of ORS 215.283 are generally described as "uses as of right," that is, uses that "may not be subjected to additional local criteria," *Brentmar v. Jackson County*, 321 Or 481, 496-97, 900 P2d 1030 (1995) (internal quotation marks omitted). In contrast, a local governing body may enact and apply additional criteria to subsection (2) uses that are more stringent than those established by state law. *Id. See also* ORS 215.283(2) (subsection (2) uses are subject to "the approval of the governing body or its designee" and the requirements of ORS 215.296).

[12] The 1989 legislation added a new paragraph (p) to ORS 215.283(1), providing that "[a] winery, as described in [ORS 215.452]" is a permitted use. Or Laws 1989, ch 525, § 2. The statute has been amended several times in the interim, and that provision is now codified at ORS 215.283(1)(n). The text has remained constant throughout except that, in 2011, the legislature added a new category of large wineries, *see* Or Laws 2011, ch 679, the requirements and limitations for which are codified at ORS 215.453. Thus, the use that is permitted by ORS 215.283(1)(n) now reads "[a] winery, as described in ORS 215.452 *or 215.453*." (Emphasis added.) ORS 215.452 has also been amended several times since 1989, including in 2011. *See* Or Laws 2011, ch 679, § 2.

[13] As noted, Stoller's existing winery was approved under that new authority in 2003.

bill represented "compromise legislation negotiated by the Oregon Winegrowers' Association, the Department of Land Conservation and Development and by the 1,000 Friends of Oregon in order to provide a simpler means for certain types of wineries to gain land use approvals in Exclusive Farm Use zones"). It is also apparent that the legislature intended to preserve the existing conditional-use pathway under ORS 215.283(2)(a) for siting wineries. *See id.* ("Wineries which do not qualify under the fairly restrictive language of this measure can still utilize existing county conditional use permit mechanisms to gain approval for location in EFU zones."); Tape Recording, House Floor Debate, HB 2903, Apr 20, 1989, Tape 15, Side 2 (statement of Rep Ron Cease) ("[C]urrent arrangements for siting wineries through conditional uses by the counties * * * does not change. We are not deleting from that process whatsoever. What the difference here is we have added now, in effect, an additional process which permits some wineries that meet these conditions to be sited this additional way."); Staff Measure Summary, House Committee on Environment and Energy, HB 2903, Apr 13, 1989 (explaining that "[n]othing in this bill alters the process of siting any larger or differing type winery").

During a special legislative session in 2010, the legislature amended ORS 215.452—the statute governing wineries permitted under the authority of ORS 215.283(1). Or Laws 2010, ch 97, § 1. Most significantly, the legislation amended ORS 215.452 to explicitly allow those wineries to sell "[i]tems directly related to *the sale and promotion* of wine produced in conjunction with the winery, the sale of which is incidental to retail sale of wine on-site * * *, wine not produced in conjunction with the winery and gifts," ORS 215.452(2)(b) (2010) (emphasis added), as well as

"[s]ervices directly related to the sale and promotion of wine produced in conjunction with the winery, the sale and delivery of which are incidental to retail sale of wine on-site, including private events hosted by the winery or by patrons of the winery, at which wine produced in conjunction with the winery is featured."

ORS 215.452(2)(c) (2010). It also clarified the meaning of "incidental" by imposing a limit on the gross income from

the sale of incidental items and services of not more than "25 percent of the gross income from the retail sale on-site of wine produced in conjunction with the winery." ORS 215.452(3). The amendments were intended to be a placeholder and were scheduled to sunset on January 1, 2013. Or Laws 2010, ch 97, §§ 2, 3; Audio Recording, Senate Committee on Environment and Natural Resources, SB 1055, Feb 9, 2010, at 1:46:32.3 (statement of Sen Jackie Winters), http://www.leg.state.or.us/listn/ (accessed Mar 14, 2013) (noting that the bill was a placeholder and there was not enough time in the session to address all of the "problems that are out there" with wineries, fruit stands, and other uses).

That was the state of the law when Stoller applied in 2011 for the permit that is at issue in this case.

With that background in mind, we turn back to petitioners' arguments on review. Before considering petitioners' primary arguments, we first reject the suggestion made by petitioners in their brief that the option to obtain approval for wineries on EFU-zoned land under ORS 215.283(2)(a) was somehow foreclosed by either the 1989 or 2010 legislation, which permitted, as noted, the siting of wineries that satisfied certain conditions without going through the conditional-use process, or that the requirements for permitted use wineries in that legislation have been superimposed on the ORS 215.283(2)(a) process. Neither enactment made *any* change to the text of ORS 215.283(2)(a). Moreover, as recounted above, the legislative history of the 1989 legislation indicates that the legislature intended to preserve the "in conjunction with farm use" option under ORS 215.283(2)(a) for wineries that do not meet the requirements of ORS 215.452. Similarly, there is nothing in the history of the 2010 bill to suggest that the legislature intended to foreclose or alter that option.[14] Thus, as LUBA

---

[14] As introduced, Senate Bill 1055 included an amendment to ORS 215.452 explicitly stating that a winery that "does not meet the criteria * * * for establishment as an outright permitted use in an area zoned for exclusive farm use under ORS * * * 215.283(1)(n)" may be approved by the local government "under the criteria for commercial activity in conjunction with farm use under ORS * * * 215.283(2)(a)." That provision was deleted by the Senate, and the legislative history does not provide an explanation for the change. We cannot assume that, simply by deleting that section of the bill, and without making any amendment to ORS 215.283(2)(a),

held, the county correctly decided that its approval of Stoller's CUP application converted its winery and tasting room operations from a permitted-use winery under ORS 215.283(1)(n) and ORS 215.452 to a conditional-use winery under ORS 215.283(2)(a).[15]

Turning now to petitioners' primary contentions, petitioners first assert that LUBA's "improper 'view'" of the approved use as an "expansion of a pre-existing winery" rather than a "brand new use—a 'wine tasting facility' hosting events at the winery and food service—" fatally infected LUBA's conclusion that the county did not err in approving Stoller's application under ORS 215.283(2)(a) to conduct farm-use-related commercial activities. Semantics aside,[16] petitioners' argument in that regard essentially reduces to the proposition that the commercial activities at issue here— that is, a tasting facility hosting events and food service— are not, and cannot be, activities in conjunction with the vineyard—*viz.*, the "farm use"—but, at most, are activities in conjunction with the winery, which is a "nonfarm" use. That argument is foreclosed by *Craven*.

As discussed above, in *Craven I*, we rejected a strikingly similar argument made by the petitioner in that case— that is, that tasting rooms and associated retail sale activities "are not connected with farm use, whether or not the winery operation itself is." 94 Or App at 54. We concluded that "incidental activities of those kinds" are permitted as farm-use-related commercial activities "to the extent that they are

the legislature intended to eliminate the ORS 215.283(2)(a) option for wineries; it is just as likely that the legislature recognized that the provision was unnecessary. Moreover, a colloquy between Senator Floyd Prozanski and Gary Conklin of the Oregon Winegrowers' Association during a committee discussion of the amendments to SB 1055 that were subsequently adopted by the Senate makes it clear that the bill as amended was intended to only affect *permitted-use wineries*. Audio Recording, Senate Committee on Environment and Natural Resources, SB 1055, Feb 18, 2010, at 1:05:58.3 (statements of Sen Prozanski and Gary Conklin), http://www.leg.state.or./listn/ (accessed Mar 14, 2013).

[15] As contemplated by its CUP application, Stoller's operation would not satisfy the then-existing requirements of ORS 215.452.

[16] We agree with respondents that it is clear that LUBA did not misunderstand the nature or scope of the county's approval. LUBA explicitly recognizes in its order that the county approved a new building, adjacent to Stoller's existing wine-processing facility, that would house a wine-tasting room, commercial kitchen, offices, and storage, as well as up to 44 events per year and meal service.

secondary to and support the wine processing activities of the winery." *Id.* The Supreme Court affirmed, concluding that LUBA was entitled to find that the incidental retail activity at issue there was "in conjunction with farm use." *Craven II*, 308 Or at 289. Thus, we reject petitioners' argument that a tasting facility and associated wine-marketing activities *categorically* may not be considered to be "in conjunction with farm use" because such activities are in conjunction with a winery rather than a viticulture farm use.[17]

That said, we turn to the heart of petitioners' argument on review, which, as we understand it, is that the activities authorized by the county here—in particular, the 44 authorized events and the commercial kitchen—exceed the scope of what is permissible under ORS 215.283(2)(a), as construed in the *Craven* decisions, and LUBA erred in concluding otherwise.[18]

Petitioners point out that even the limited commercial activities at issue in *Craven* (other than the winery itself)—that is, the construction of a tasting room and "sales of peripheral items, such as glasses and T-shirts"—presented this court with a "close" question as to whether they were properly considered to be "in conjunction with farm use." Thus, according to petitioners, it follows that "facility rentals or other activities that are, at best, tangentially related to the marketing of farm products," cannot possibly fall within the limited scope established by *Craven*. They argue:

---

[17] As LUBA correctly reasoned,

"[w]hile it may be possible to analyze the kitchen and additional events as commercial activities that are in conjunction with the existing Stoller Winery, it is also possible to analyze the kitchen and additional events as additions that are to become part of the existing Stoller Winery, so long as they are accurately viewed as incidental and secondary to the processing of grapes into wine for sale."

[18] Although, as the Supreme Court explained in *Farmers Ins. Co. v. Mowry*, 350 Or 686, 697, 261 P3d 1 (2011), we no longer adhere to the rule that the Supreme Court's interpretation of a statute becomes part of the statute itself, subject only to legislative revision, *see, e.g., State v. King*, 316 Or 437, 445-46, 852 P2d 190 (1993), no party here argues that we should abandon the precedent established in *Craven*, and we decline to do so. *See Farmers*, 350 Or at 698 ("[W]e begin with the assumption that issues considered in our prior cases are correctly decided, and 'the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent.'" (Quoting *State v. Ciancanelli*, 339 Or 282, 290, 121 P3d 613 (2005).)).

> "LUBA erred in concluding that the County's approval of 13,000 visitors per year to the Stoller events center could be construed as subordinate to the vineyard, when a significant portion of the events have no connection to the act of farming. There is no comparison between such an urban draw of visitors and the commercial sales of embossed glasses and t-shirts discussed in *Craven*."

Petitioners are correct, of course, that the nature of some of the commercial activities approved here—in particular, as they emphasize, the events and food-service facility—differs significantly from the sale of souvenirs, T-shirts, posters, and books that were at issue in *Craven*. However, the type of activity proposed is not necessarily the determining factor; rather, as the Supreme Court explained in *Craven II*, "to be 'in conjunction with farm use,' the commercial activity must enhance the farming enterprises of the local agricultural community to which the EFU land hosting that commercial activity relates." 308 Or at 289. As we put it in *Craven I*,

> "[a] commercial use which assists farmers in processing and marketing crops can be as supportive of agricultural operations as one which aids them in producing crops. The fact that the marketing technique may prove to be effective enough to attract travelers hardly means that the farmers whose processed produce the travelers purchase are not benefited."

94 Or App at 54. Similarly, the Supreme Court, in determining that the incidental sale of souvenirs advertising the winery was appropriately permitted as "in conjunction with farm use," reasoned that that activity, because it might encourage people to visit the area and buy the produce of the vineyards and surrounding farms, may "reinforce the profitability of operations and the likelihood that agricultural use of the land will continue." *Craven II*, 308 Or at 289.

That is not to say that any commercial activity that is tied, however tangentially, to the marketing of wine is allowable as a farm-use-related commercial activity in connection with a vineyard operation. Rather, it is patent from the *Craven* decisions that any commercial activity beyond the direct processing and selling of wine must, to be approved as a commercial activity in conjunction with the

farm use of viticulture, be both "incidental" and subordinate to the processing and selling activities of the winery. *Craven II*, 308 Or at 289; *Craven I*, 94 Or App at 54. As we warned in *Craven I*, the incidental and secondary winery activities cannot become "the tail [that] wag[s] the dog." 94 Or App at 54. As always, farm-use-related commercial activity must promote "the policy of preserving farm land for farm use." *Craven II*, 308 Or at 289.

We agree with LUBA that the county's approval of 44 events annually and a commercial kitchen at the Stoller Winery comes dangerously close to creating a scenario in which the incidental and secondary activities (events and food service) overtake the primary activity (the processing and selling of wine). However, we also conclude that LUBA did not err in determining that, as conditioned, approval of Stoller's application nonetheless does not fall outside the scope of ORS 215.283(2)(a) as construed in the *Craven* decisions.

As discussed, a farm-use-related commercial activity is a conditional use, determined by the county on a case-by-case, fact-specific basis, rather than a permitted use under ORS 215.283(1)(n). Here, the county required that the 44 events be "directly related to" the sale and promotion of wine produced at the winery. In addition, income from the approved non-wine-related activity may not exceed 25 percent of the gross income from onsite retail sales of wine from the winery. Moreover, the ability to provide meal service is limited to the 44 events, and the onsite kitchen may not serve more than 72 guests per event. And, Stoller must submit an annual report demonstrating that it is meeting the imposed conditions. We agree with LUBA that those conditions are designed to ensure that the event and food-service activities will remain incidental and secondary to the processing and sale of wine.

Moreover, LUBA concluded—and petitioner does not appear to dispute—that the event and food-service activities are intended to promote Stoller wines and can be reasonably expected to enhance Stoller's wine marketing. As LUBA concluded, "the activities, kitchen and tasting room will operate in concert to improve the chances that

the Stoller Winery will be successful and continue to provide a customer for Stoller Vineyard's grapes." In short, the activities will "reinforce the profitability of operations and the likelihood that agricultural use of the land will continue," *Craven II*, 308 Or at 289, thus promoting the goal of preserving farm land.[19]

Accordingly, we conclude that LUBA did not err in affirming the county's approval of Stoller's application as "[c]ommercial activities that are in conjunction with farm use" under ORS 215.283(2)(a).

Affirmed.

---

[19] Petitioners do not challenge LUBA's determination that the county adequately demonstrated that the approval satisfies ORS 215.296(1)—that is, that it will not "[f]orce a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use" or "[s]ignificantly increase the cost of accepted farm or forest practices" on those surrounding lands. Therefore, we do not address that issue.